Marmer et al., Appellants, *v.* Pennsylvania
Public Utility Commission.

Argued June 11, 1959. Before RHODES, P. J., WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ. (HIRT and GUNTHER, JJ., absent).

*Laurence H. Eldredge*, with him *Sylvan D. Einhorn*, for appellants.

*William A. Goichman*, Assistant Counsel, with him *Thomas M. Kerrigan*, Counsel, for Pennsylvania Public Utility Commission, appellee.

*George G. Parry, Jr.*, with him *Irving R. Segal*, *William A. Schnader*, and *Schnader, Harrison, Segal & Lewis*, for complainant, intervening appellee.

OPINION BY RHODES, P. J., September 16, 1959:

This is a complaint proceeding. The Yellow Cab Company of Philadelphia filed a complaint with the Pennsylvania Public Utility Commission charging respondents, Francis Marmer and Joseph Marmer, copartners trading at Mitchell's Cab Service, with transportation of persons for hire throughout the City of Philadelphia in violation of their certificate of public convenience. The commission sustained the complaint, ordered respondents to cease and desist from performing transportation except as presently authorized, and granted leave to file an application for amendment of the certificate. Respondents have appealed.

The certificate of public convenience held by the respondents authorizes them to ". . . transport, as a common carrier by motor vehicle, persons upon call or demand in the City of Philadelphia—Stands: 62nd Street and Woodbine Avenue, and the Pennsylvania Railroad Station at Overbrook." It is the interpretation of this certificate as to the extent of the rights granted thereby which forms the determinative issue of this case. Respondents claim that they are authorized to render service throughout the City of Philadelphia notwithstanding the designation of stands in the certificate. The Yellow Cab Company contended and the commission determined that the authority of respondents is restricted to service originating at the stands specified in the certificate. There is no dispute of the fact that respondents have been rendering call and demand service throughout the City of Philadelphia, whether originating at the designated stands or otherwise. In fact, the designated stands have been abandoned or lost to respondents without commission approval.

On November 13, 1956, respondents purchased the operating rights of Albert R. Mitchell upon application

to the commission for the sum of $11,000. Mitchell had operated this agency service in Overbrook for approximately thirty-five years; his father had operated it before him, beginning with a livery business about 1900. Mitchell apparently obtained his first certificate of public convenience on January 5, 1931. It was thereafter renewed in 1933 and 1935. In 1936 the commission granted the renewal of the certificate phrased in the language now appearing in respondents' certificate. When respondents acquired the Mitchell rights in 1956, they acquired only those rights which Mitchell had subject to the same limitations and restrictions. See *Follmer Trucking Company v. Pennsylvania Public Utility Commission*, 189 Pa. Superior Ct. 204, 220, 150 A. 2d 163.

The question arises as to the nature of the authority of Mitchell which was transferred to respondents. As an administrative agency the commission is peculiarly fitted to interpret its own orders and to determine the extent and the limit of transportation rights granted to a carrier under its certificate of public convenience; and this Court will not set aside a construction placed upon the certificate by the commission unless the result is clearly erroneous, arbitrary, and unsupported by the evidence. *W. J. Dillner Transfer Company v. Pennsylvania Public Utility Commission (No. 1)*, 175 Pa. Superior Ct. 461, 463, 107 A. 2d 159. In the present case the commission determined that the first part of the certificate granting authority to transport on call or demand within the City of Philadelphia was limited by the subsequent designation of two stands in the Overbrook area. The commission by such interpretation gave effect to all of the provisions of the certificate.

In referring to the language relative to stands in Overbrook the commission stated: ". . . it does not fol-

low that the language it [the commission] chose to use in the instant case had no meaning or no restrictive effect. If the Commission had intended to grant city-wide authority, it would have been pointless to designate in the authorizing clause where the applicant's stands should be located. The only sensible reason for the inclusion of the stand locations would be to limit or restrict the authority granted to service requested at or from the designated stands."

As in the interpretation of statutes, ordinary rules of construction require that in interpreting the orders of administrative agencies effect must be given to all of the words used, treating none as surplusage unless no other construction is reasonably possible. *Allentown v. Pennsylvania Public Utility Commission,* 173 Pa. Superior Ct. 219, 222, 96 A. 2d 157; *Charch v. Pennsylvania Public Utility Commission,* 183 Pa. Superior Ct. 371, 375, 132 A. 2d 894.

The construction placed upon this certificate by the commission is supported by the evidence. Historically the certificate has been considered a restricted one. The service originally rendered by Mitchell and his father, as later certified by the commission, was a local community type service in the Overbrook area of Philadelphia. In prior proceedings before the commission, the operating rights were treated as such.[1]

---

[1] In 1946, when Mitchell applied to the commission to increase the number of his cabs from three to six, he testified:

"Q. And your service is restricted, is it not, to the operation of two stands, one stand being at 62nd and Woodbine Avenue and the other at the Pennsylvania Railroad? A. That is where we operate from, we were operating from 62nd and Woodbine Avenue and Overbrook Station, that is all I want to operate from."

Mitchell was also asked: "Q. In other words, the service that you will give would be over the telephone or by persons coming to the station and asking for the cabs? A. I want to give the same service we have been giving all our lives and that is over forty

The testimony of Mitchell in the present proceeding is to the same effect. When asked to describe his business prior to the transfer to respondents he stated: ". . . my local work . . . consisted of Overbrook Station, to and from—back and forth carting all the people through anywhere in Overbrook to the city, to the hospitals around and including up as far as Bryn Mawr, and anywhere I would have, on call and demand in the City of Philadelphia. . . . Our business originated here in Overbrook—. . ." He testified that work in the center of the City of Philadelphia consisted of going to the city and bringing people back when they would call him or tell him that they desired his service to Overbrook. Mitchell recognized that without a call to his stand he had no authority to pick up passengers in central Philadelphia, and stated that he had not instructed his drivers to cruise for passengers in that area. One of the respondents, Joseph Marmer, worked for Mitchell on a part-time basis prior to the transfer.

It is obvious therefore that the stand designations were recognized and understood as definite limitations upon the operating authority granted by this certificate until respondents acquired the operation. Apparently recognizing that the stands specified in the certificate had been abandoned, the commission, in its cease and desist order in the present complaint proceeding, left the way open for respondents to apply by amendment to their certificate for the designation of other stands in the Overbrook area from which service could be legally furnished.

---

years; it is serving a community, gentlemen, to be honest, and getting back to that spot and taking care of them. I am not interested in doing work for the City of Philadelphia; I have lived in the community a long time."

Mitchell's counsel then stated: ". . . there is no question about it that this applicant is confined to certain stands from which he gets his business, . . ."

The type of service contemplated at the time of the original application is a significant consideration. *Weston Hauling, Inc. v. Pennsylvania Public Utility Commission,* 185 Pa. Superior Ct. 503, 509, 138 A. 2d 286. As we have indicated, Mitchell and his father before him rendered a local community service in the Overbrook area. That is what Mitchell was certificated to provide, and that is all that respondents acquired from him with the approval of the commission.

The evidence in this record indicates that when respondents commenced city-wide operation the local service to be served under their certificate suffered. Mitchell referred to his efforts to keep respondents operating in the Overbrook area and to service the trade built up by himself and his father. Because of respondents' apparent neglect of the Overbrook business, Mitchell was receiving complaints from his former customers even at the time of the hearings. In the latter respect, Joseph Marmer, one of the respondents, testified that the Pennsylvania Railroad Company terminated respondents' right to occupy the Overbrook station as respondents were not giving "the right and proper service." The obvious neglect of the Overbrook business by respondents because of their erroneous interpretation of their certificate and their desire to operate city-wide was a matter to be considered by the commission in the public interest. See *Day v. Public Service Commission,* 107 Pa. Superior Ct. 461, 463, 464, 164 A. 65; *Posten Taxi Company v. Pennsylvania Public Utility Commission,* 164 Pa. Superior Ct. 13, 18, 63 A. 2d 424.

Respondents' argument appears to be concerned with the authority they think they should have rather than with the authority originally granted to Mitchell and transferred to them. They agree that when the certificate was originally granted to Mitchell the stand

designation did have significance, but suggest that in the year 1958 mere reference to stands does not limit their authority. It is argued that changed circumstances and an announced change in commission policy regarding stands operate to make the stand designations in their certificate mere surplusage and obsolete. Such argument does not answer the real issue before the commission. Whatever authority the respondents desire to have, whatever change in circumstances may have occurred, and any change in policy declared by the commission in another proceeding cannot automatically amend their certificate and increase their operating authority. The authority to transport passengers for hire on a city-wide basis is certainly of much greater substance and of an entirely different character and nature than the rights which Mitchell had and which were transferred to respondents; those rights may not be enlarged by ex parte action. See *Whinney v. Public Service Commission,* 116 Pa. Superior Ct. 472, 477, 176 A. 753.

Moreover, a general policy formulated by the commission is not a substitute for the evidence necessary to effect a change in substantive rights. *Aizen v. Pennsylvania Public Utility Commission,* 163 Pa. Superior Ct. 305, 316, 60 A. 2d 443; *W. J. Dillner Transfer Company v. Pennsylvania Public Utility Commission,* 186 Pa. Superior Ct. 526, 532, 533, 142 A. 2d 419. Consequently, the "policy" announced in the *Application of Cowan,* Application Docket No. 20708, 1934, 13 P.S.C. 428, to the effect that certain stand restrictions in Philadelphia no longer served the public interest, did not in and of itself eliminate the restrictions appearing in the certificate of Mitchell ultimately acquired by respondents.

In this case the order of the commission grants applicants leave to apply formally for an amendment to

their certificate. If circumstances have changed in the operation of this business, the respondents can establish the effect of such change before the commission. Even the *Cowan* case upon which respondents heavily rely provided for orderly formal petitions for the modification of other certificates in the City of Philadelphia. Respondents in their brief recognize that other independent taxicab operators have had the stand designations in their certificates modified by proper proceedings.[2] This is the procedure which respondents should follow. On the present record it is clear that respondents never acquired the extensive rights which they now claim to have.

The order of the commission is affirmed.

---

[2] In fact, in 1957, respondents applied for an amendment to their certificate to delete the stand restrictions appearing therein. After hearings, however, the application was withdrawn on the "advice of counsel."