## Pittsburgh Coal Company *v.* Sanitary Water Board.

408

Argued April 14, 1971, before President Judge Bow-
MAN and Judges CRUMLISH, JR., KRAMER, MENCER and
ROGERS. Judges WILKINSON, JR., and MANDERINO did
not participate.

*Harold R. Schmidt,* with him *Vernon N. Fritchman, Gary H. McQuone, Henry McC. Ingram, Robert S. Barker* and *Rose, Schmidt & Dixon,* for appellant.

*Richard B. Springer,* Assistant Attorney General, with him *William M. Gross,* Assistant Attorney General and *J. Shane Creamer,* Attorney General, for appellee.

OPINION BY JUDGE CRUMLISH, JR., January 18, 1972:

This appeal is from an order of the Sanitary Water Board of the Commonwealth of Pennsylvania[1] entered on November 20, 1970, which refused Pittsburgh Coal Company's application for a mine drainage permit for its operation of the Hutchinson Mine, a bituminous coal mine, located in Westmoreland County, Pennsylvania. The order also commanded Pittsburgh Coal Company (appellant) to cease its operation of that mine by December 21, 1970. We, on December 11, 1970, granted a supersedeas.

The Hutchinson Mine is the last operating deep mine in a large underground coal basin in Westmoreland County, known as the Irwin Basin. Irwin Basin is approximately twenty-one miles long and seven miles wide; it is parabolic or dish-shaped and dips from the north to the south. The northern tip or end is at an elevation of approximately 900 feet and the outside rim or outcrop of the coal seam rises to an elevation of

---

[1] The Act of December 3, 1970, P. L.    , No. 275, §30, 71 P.S. §510-103, abolished the Sanitary Water Board and placed the duties of the Board within the Department of Environmental Resources, effective January 19, 1971.

410

between 900 and 1100 feet. The coal seam is approximately 10 feet in depth and would be geologically described as synclinal, the axis of which runs north-south dividing the parabola in half. Perhaps one could best visualize the Irwin Basin by thinking of a canoe balanced on the bottom of its southern tip with the northerly end protruding upward in a slanted position and the structural material of the canoe representing the coal seam. The Hutchinson Mine is at this southern tip of the basin, at approximately the lowest point in the dip.

Mining has taken place in the Irwin Basin[2] since 1852. There have been eighteen major coal mines operating there, all of which are now closed and abandoned. Today, the Irwin Basin is completely mined out, except for the unmined coal in the Hutchinson Mine. Appellant has only been involved in the operation of this mine and has had nothing to do with any other mining operation in the Irwin Basin.

An underground lake or pool, covering 23,780 acres and estimated to contain from 100 to 350 billion gallons of polluted water, has formed in the Irwin Basin as a result of ground water accumulating in the abandoned mines. This pool, which under the Clean Streams Law[3] is "water of the Commonwealth,"[4] has gravity discharges

---

[2] Unless otherwise indicated, the term "Irwin Basin" when used herein will indicate all of the Irwin Basin outside of and not including the Hutchinson Mine.

[3] Act of June 22, 1937, P. L. 1987, as amended, 35 P.S. §§691.1 et seq.

[4] Section 1 of the Clean Streams Law, as amended in 1965 and 1970, 35 P.S. §691.1 defines "waters of the Commonwealth" as including "any and all rivers, streams, creeks, rivulets, impoundments, ditches, water courses, storm sewers, lakes, dammed water, ponds, springs and all other bodies or channels of conveyance of surface and underground water, or parts thereof, whether natural or artificial, within or on the boundaries of this Commonwealth."

or natural outflows at three locations to the northwest of the Hutchinson Mine, namely: Irwin, 8.5 million gallons of water per day; Guffey, 5.1 million gallons of water per day; and Marchand, 3.4 million gallons of water per day.

However, the Hutchinson Mine is separated from adjacent abandoned mines in the Irwin Basin by a protective barrier-pillar of coal over 100 feet in thickness, as required by Section 291 of the Act of July 17, 1961, P. L. 659, 52 P.S. §701-291. This barrier of coal acts as a dam to keep the bulk of the pool from entering appellant's mine. Prior to the time appellant acquired its mine, the barrier of coal between its mine and the Magee Mine to the east was breached by previous mining operations. At the present time, 2.17 million gallons of water per day finds its way through, over and around the coal barrier and through the Magee opening into the Hutchinson Mine.

The issue here is whether appellant is responsible under prevailing law for treatment of this 2.17 million gallons of water per day which must be removed or discharged from the Hutchinson Mine in order to mine the coal therein.

Appellant is at the present time pumping approximately 3.44 million gallons of water per day, including the 2.17 million gallons of water per day coming from the other mines in the Irwin Basin, from the Hutchinson Mine, at two discharge points. Appellant, in its application for a mine drainage permit, proposes to treat only the 1.27 million gallons of water per day originating in the Hutchinson Mine.

This factual background leads us directly to the central issue in this case. Can the Sanitary Water

---

We agree with the adjudication of the Sanitary Water Board in its conclusion that "under the Clean Stream Law, even the Irwin Basin pool is 'water of the Commonwealth.' . . ."

Board, under the "Clean Streams Law," require the operator of a deep mine, as a condition to discharge of his own mine drainage, to treat "waters of the Commonwealth" that have flowed or seeped into the operator's active mine from an underground pool formed by independent inactive mines, when that water was polluted before entry into the active deep mine and upon its removal from the active deep mine the level of pollution in the water is not increased? We answer this question in the negative and in so doing reverse the Board's order.

With the object of more clearly delineating the present law of this Commonwealth as it pertains to stream pollution, we consider briefly earlier legislation.

The first relevant legislation in Pennsylvania was the Act of June 22, 1937, P. L. 1987, 35 P.S. §§691.1 et seq., the so-called "Pure Streams Law." In Article III of this Act, which dealt with industrial waste, Section 310 excluded acid mine drainage from the operation of the Act and provided: "Section 310. Acid Mine Drainage and Silt.—The provisions of this article shall not apply to acid mine drainage and silt from coal mines until such time as, in the opinion of the Sanitary Water Board, practical means for the removal of the polluting properties of such drainage shall become known." Also significant was Section 306, which provided: "Section 306. Protection of Clean Waters.—After the effective date of this act, no municipality or person shall ever discharge, drain or permit to be washed into the clean waters of this State any sewage or industrial waste. 'Clean waters' are hereby defined to mean waters which are, at the effective date of this act, unpolluted and free from any discharge or drainage of sewage, but the Sanitary Water Board may permit discharge into such waters of sewage or industrial waste that has been completely treated." It is evident from the foregoing

that the legislative intent, in 1937, was to exempt problems relating to acid mine drainage from the operation of the Pure Streams Act.

The next statutory enactment was the Act of May 8, 1945, P. L. 435, 35 P.S. §§691.1 et seq. The 1945 legislation amended the 1937 Act by changing Section 310 to read, in pertinent part, as follows: "It shall be unlawful and a nuisance to discharge, or to permit the discharge, of acid mine drainage (1) into 'clean waters' of the Commonwealth which are being devoted or put to public use at the time of such discharge; or (2) into 'clean waters' of the Commonwealth, unless the Commonwealth, after the Sanitary Water Board has approved plans of drainage pursuant to section three hundred thirteen hereof, and has set a reasonable time not to exceed one year within which such pipes, conduits, drains, tunnels or pumps as may be necessary to receive such acid mine drainage at the point or points where such acid mine drainage is delivered, as provided in this section, shall be constructed and put into operation by the Commonwealth, has failed to construct and put into operation the same within such time. . . ." At the same time, Sections 311 and 312 were added to the statute. Section 311 authorized the Sanitary Water Board to acquire easements and rights of way, by purchase, condemnation or otherwise, and Section 312 set forth the condemnation procedures to be followed.

It is clear from the 1945 amendments that the special problems in the coal industry relating to acid mine drainage were recognized and acknowledged by the General Assembly. Furthermore, Section 311, as it appeared in the 1945 act, demonstrates that the General Assembly was not in any way attempting to clean up previously polluted waters but only to protect waters which were " 'clean waters' on or subsequent to the first day of January, one thousand nine hundred forty-

four." Thus, after the passage of the 1945 amendments, Pennsylvania clean streams legislation prohibited only discharge of acid mine water into clean waters devoted to public use.

The statutory provisions to which we have referred constituted a legislative acquiescence in the continuation of the discharge of acid mine drainage into waters already polluted.

The statutory framework was unchanged until The Clean Streams Law was extensively amended by the Act of August 23, 1965, P. L. 372, 35 P.S. §§691 et seq. (effective January 1, 1966). The 1965 act represented a significant departure from previous legislation. A new section was added which provided: "Section 4. Findings and Declarations of Policy.—It is hereby determined by the General Assembly of Pennsylvania and declared as a matter of legislative findings that:

. . . .

"(2) The present Clean Streams Law contains special provisions for mine drainage that discriminate against the public interest.

"(3) Mine drainage is the major cause of stream pollution in Pennsylvania and is doing immense damage to the waters of the Commonwealth.

"(4) Pennsylvania, having more miles of water polluted by mine drainage than any state in the nation, has an intolerable situation which seriously jeopardizes the economic future of the Commonwealth. . . ."

Further, the General Assembly announced that it was the policy of the Commonwealth to ". . . restore to a clean, unpolluted condition every stream in Pennsylvania that is presently polluted. . . ."

Under the 1965 act, acid mine drainage was brought within the definition of industrial waste. Thus, discharges of acid mine drainage became subject to Section 307 of the Act. That section provided: "No person shall

hereafter . . . operate any establishment which, *in its operation,* results in the discharge of *industrial wastes* which would flow or be discharged into any of the waters of the Commonwealth and thereby *cause a pollution* of the same. . . ." (Emphasis added.) For the first time, then, the discharge of acid mine drainage into polluted waters was prohibited in Pennsylvania.

The 1965 act also added a new Section 315 to the Act. It stated in part: "It shall be unlawful to open, reopen, or continue in operation any coal mine, or to change or alter any approved plan of drainage and disposal of industrial wastes, unless and until the board, after consultation with the Department of Mines and Mineral Industries, has issued a permit approving the plan or change of plan. A permit *shall not be issued* if the board shall be of the opinion that the *discharge from the mine* would be or become inimical or injurious to the public health, animal or aquatic life, or to the use of the water for domestic or industrial consumption or recreation. . . ." (Emphasis supplied.)

The application before the Sanitary Water Board was filed June 28, 1968 and adjudicated under the Clean Streams Law as it existed at that time.[5] However, the Legislature in July 1970 altered and amended the provisions of the Clean Streams Law relating to mining operations. Act of July 31, 1970, P. L.    , No. 222, 35 P.S. §§691.1 et seq. Section 307 was altered to read in part: "No person . . . shall discharge or permit the discharge of industrial wastes in any manner . . . into any of the waters of the Commonwealth unless

---

[5] The hearings before the board were held March 5 and March 6, 1969, prior to the passage of the 1970 amendments to the Clean Streams Law. Therefore, although the Adjudication was delivered five months after passage of the amendments, the Clean Streams Law was considered by the board in its 1969 form without discussion of its alteration.

such ·discharge is authorized by the rules and regulations of the board or such person . . . has first obtained a permit from the department. . . ." In this way greater control over . the discharge of industrial waste was placed in the˙hands of the Board. In a similar fashion, Section 315 was amended to provide greater control by the Board over mine operations. That section now provides in part:·"No person shall operate a mine or allow a discharge from a mine into the waters of the Commonwealth unless such operation or discharge is authorized by the·rules and regulations of the board or such person . . . has first obtained a permit from the department. . . ."

· Since the Board has based its adjudication upon the 1965· form of the Clean Streams Law, our analysis of the Board's· decision must necessarily involve the 1965 form· of the law. After careful consideration of the former sections and their amended forms, we discern nothing in the. present formulation of the law which would conflict with or mitigate against the holding of this Court.

In light of this statutory background we turn to the. holding of the Sanitary Water Board: "This·Board looks to the Clean Streams Law and the official regulations promulgated thereunder for the basis of the decision in this case. Section 316(b) [315(b)] of that law states in part:. 'It shall be unlawful to open, reopen, or continue in operation any coal mine, or to change or alter any approved plan of drainage and disposal of industrial wastes unless and until the board, after consultation with the Department of Mines and Mineral Industries, has issued a permit approving the plan or change of plan. A permit *shall not be issued* if the Board shall be of the opinion that the *discharge from the mine* would be or become inimical or injurious to the public health, animal or aquatic life, or to the use

of the water for domestic or industrial consumption or recreation.' [(Emphasis in adjudication)]

"In addition thereto, 35 P.S. Sec. 691.1 states in part:

' "Pollution" shall be construed to mean noxious and deleterious substances rendering unclean the waters of the Commonwealth to the extent of being harmful or inimical to the public health, or the animal or aquatic life, or to the use of such waters for domestic water supply, or industrial purposes, or for recreation. The Sanitary Water Board shall determine when the discharge of any industrial waste, or the effluent therefrom, constitutes pollution, as herein defined, and shall establish standards whereby and wherefrom, so far as reasonably practicable and possible, it can be ascertained and determined whether any such discharge does or does not constitute pollution as herein defined.'

"The Sanitary Water Board has determined the specific concentrations of iron and acid which constitute pollution, as defined above, and these determinations are set forth in the official Rules and Regulations of the Sanitary Water Board, Article 900, Section 6, which provides in part:

'A. There shall be no discharge of mine drainage which is acid.

'B. There shall be no discharge of mine drainage containing a concentration of iron in excess of seven milligrams per liter.

'C. The pH of discharges of mine drainage shall be maintained between 6.0 and 9.0.

'D. The Board will grant an exception to any of the above limitations only when the operator has affirmatively demonstrated that operation under the proposed exception would not cause pollution to waters of the Commonwealth.'

"Therefore, when the 'discharge from the mine,' which encompasses drainage caused by whatever source,

contains concentrations of acid or iron in excess of the limits established by the Board, a mine drainage permit 'shall not be issued' unless 'the operator has affirmatively demonstrated that [his] operation . . . would not cause pollution to waters of the Commonwealth.' "

The appellant concedes that the 2.17 million gallons of water per day coming from the underground pool in the Irwin Basin which it pumps from its Hutchinson Mine is polluted with an iron and acid content substantially in excess of the maximum acceptable quality standard set by the Sanitary Water Board. Moreover, appellant does not contend that this discharged water would not be injurious to the public health, animal or aquatic life, or to the use of the water for domestic or industrial consumption or recreation. Appellant objects to the Board's conclusion that, "when the 'discharge from the mine,' encompasses *drainage caused by whatever source,* contains concentrations of acid or iron in excess of the limits established by the Sanitary Water Board, a mine drainage permit 'shall not be issued.' " (Emphasis added.)

We agree that the Board's holding contains two fatal flaws: (1) it requires applicants to treat "drainage caused by whatever source"; (2) and, it finds that this applicant has not demonstrated that the discharge of the fugitive water herein involved would not cause *"pollution"* to the "waters of the Commonwealth."

It is the unusual factual situation of this conflict which sets it apart from the clearly enunciated position of the statutory and regulatory law heretofore stated. In this case, "waters of the Commonwealth" contained in a man-made underground lake, and naturally contaminated while therein,[6] are naturally flowing

---

[6] This natural contamination is described in appellee's brief as follows: "It is generally agreed that pollution occurs in mine water as a result of iron and acid salts being dissolved in the water. The

through man-made caverns, not constructed by appellant, onto appellant's land. Appellant seeks to divert this water into a natural, surface body of "water of the Commonwealth," to be able to regain the use and enjoyment of his land. It is the diversion of the Commonwealth's waters from one channel to another which inspires the Board to disallow absent treatment of the diverted water. Clearly, then, this case is not the usual case involving the discharge of acid mine drainage resulting from *that applicant's mining operations.* We must be careful to consider the statutory provisions and the Board's holding in this light.

The Board's holding is essentially that "waters of the Commonwealth" already in a polluted state, when pumped without altering its composition into other "waters of the Commonwealth," in order to maintain a mining operation, constitute *pollution* in the form of acid mine drainage requiring treatment under the Clean Streams Law. We cannot agree with the conclusion that this discharge causes pollution within the meaning of the Clean Streams Law.

Pollution is defined in the Clean Streams Law, 35 P.S. 691.1 as "noxious and deleterious substances ren-

iron and acid salts are formed on the surface of coal measures exposed to the mine atmosphere by the oxidation of pyritic material in the exposed coal. The salts are then washed into the mine water, causing pollution. Thus, underground pools of water are continually being polluted and will continue to be so for perhaps hundreds of years, unless the mine workings are completely flooded, eliminating the air required for oxidation.

"As a result of this pollutional phenomenon, when the drainage of an active mine discharges into an underground pool, regardless of how pure or clean the water is as it discharges from the mine into the pool, it will be polluted by the time it is discharged as a part of the pool into a stream of the Commonwealth, if such discharge of the pool occurs. The pollution will result both from the dissolving of iron and acid salts by the drainage and by its mixture with the already polluted pool."

dering unclean the waters of the Commonwealth. . . ."[7] In the instant case, we are concerned with an underground pool containing "waters of the Commonwealth" *already* "unclean" with "noxious and deleterious substances". We hold that the Clean Streams Law did not intend that this "water of the Commonwealth" would itself become a "noxious and deleterious substance" by reason of its being intermingled with other cleaner "water of the Commonwealth." To hold otherwise would mean that whenever two bodies of water are diverted into a common flow for industrial or manufacturing purposes, if either or both bodies contain deleterious substances in its natural state, then that water becomes "pollution" because it must by definition render the other body unclean. This was not the intent of the Clean Streams Law. Under the Clean Streams Law, unlike previous laws, pollution occurs when noxious and deleterious substances are *first* discharged into *any* "waters of the Commonwealth."[8] The statutory scheme

---

[7] See note 6, *supra*.

[8] The Sanitary Water Board in its "Guidelines Regarding Mining in Areas Affected by Inactive Workings" mitigates the liability of mine owners for the discharge of acid mine drainage into underground pools, which are, under the Clean Streams Law, "waters of the Commonwealth." Although the Clean Streams Law would prohibit polluting of these pools, because of the natural pollution of such waters discussed in note 6, *supra*, the Board only prohibits the drainage of mine water that would be more polluted than the pool into which it drains. The Board admits that the practical result of this guideline is that no treatment will be required because the discharge will invariably be less polluted than the pool. As a result, the water flowing into appellant's mine contains both natural pollution unconnected with appellant's operation and former acid mine drainage from other mines by permission of the Board. It now seeks to place the burden of remedying this pollutional problem upon an unfortunate victim of this water's course who is faced with an impractical task in order to realize any use and enjoyment of his land. See the discussion relating to the constitutionality of the Board's position, *infra*.

does not speak to the proliferation of pollutants by intermingling Commonwealth water. Since the discharge of the underground pool into the surface stream does not by law cause "pollution," it was unnecessary for the applicant to "affirmatively demonstrate" that very point.

We also hold that the Board erred in finding applicant responsible for all discharges "caused by whatever source." The Clean Streams Law is concerned with the discharge of "industrial waste" resulting in pollution. "Industrial waste" is defined as "any liquid, . . . resulting from any manufacturing or industry, . . . and mine drainage. . . ." §691.1.[9] The water in question results from gravity flow from an underground pool. The diverting of this water from one natural course to another to enable an industrial pursuit does not make it "industrial waste" resulting from "industry."

Nor is it mine drainage under the factual situation in this case.[10] This term has apparently not been defined heretofore in its relation to water pollution. The Irwin Basin Pool, while it resulted from the operation of separate mining operations, now exists as a homogeneous body of water naturally polluted by its walls. Since the mines which it occupies are abandoned and

---

[9] Although the 1970 amendment to the definition of "industrial waste" found in 35 P.S. §691.1 adds the following: " 'Industrial waste' shall include all such substances whether or not generally characterized as wasted," we hold that that amendment does not bring within its definition diverted but unaltered water flow.

[10] While the 1970 amendments to the Clean Streams Law broaden the Board's control over mining operations by rendering all operations and discharges under the Board's jurisdiction (this may have eliminated the requirement that the discharge be industrial waste), under the Board's regulations, the discharge still must either be industrial waste, or pollution in some other form. This discharge being neither, the 1970 amendments do not affect our disposition of this case.

no longer exist, can we continue to call this underground water "mine drainage"? We think not. Indeed, the Legislature in 1965 directed the Secretary of the Department of Mines and Mineral Industries to initiate a program for correcting "pollution from abandoned deep and strip mines. . . ." Act of December 15, 1965, P. L. 1075, 35 P.S. §760.1.[11] Pollution resulting from mining operations ceased to be "mine drainage" within the meaning of the Clean Streams Law when the mining operations cease.[12] The 1.27 million gallons of water per day originating in the Hutchinson Mine is clearly mine drainage subject to both the Clean Streams Law and the Board's regulation, *supra*. But the 2.17 million gallons of water per day flowing into the mine as part of the Irwin Basin pool is not "drainage" but the natural flow of "waters of the Commonwealth," the diversion of which does not revert it from that status to the status of "mine drainage." "Mine drainage," like other "industrial waste" arises from the property of the mining applicant as a result of his mining operations.[13]

[11] The problem of acid water from abandoned mines, where mining operations ceased before January 1, 1966, is the responsibility of the Commonwealth. See 35 P.S. §691.315(a).

[12] The fact that a discharge from land previously mined ceases to be "mine drainage" does not terminate the power of the Commonwealth to require its purification. In the 1970 amendments to the Clean Streams Law the responsibility for discharges assumed in obtaining a mining permit specifically includes responsibility for any discharge "which occurs after mining operations have ceased. . . ." This responsibility is limited by the provision cited in note 11, *supra*.

[13] See the opinion by Judge WILKINSON, specially assigned to the Court of Common Pleas of Dauphin County, adopted this day by the Court in *Harmar Coal Co. v. Sanitary Water Board*, 4 Pa. Commonwealth Ct. 435, 285 A. 2d 898 (January 18, 1972), in which he states: "The Commission in this Adjudication attempts to rewrite the provisions of the Clean Streams Law wherein it clearly refers to the restrictions applicable to coal mine operators as being

The discharge here involved is not so constituted. We therefore hold that the diversion into another water course of the water naturally flowing into the applicant's mine from the Irwin Basin pool is not a "discharge from the mine" of "drainage and . . . industrial waste" within the meaning of Section 315 of the Clean Streams Law. The Board erred in basing its refusal of the requested drainage permit upon Section 315.

In passing upon these issues we must acknowledge that the statutory provisions cited by the Board in its adjudication are capable of interpretation as presented by the Board. Although we have already stated we do not agree with this interpretation, we present one further and compelling reason why the Board's decision cannot stand.

The application of the Board's interpretation of the statutory law to appellant, to the extent that it denies to appellant the use and enjoyment of its property unless it assumed responsibility for the treatment of fugitive water entering its mine through no fault of appellant,[14] constitutes an unreasonable, arbitrary and oppressive exercise of the police power. The Board would hold that the Legislature, in exercise of its police power, not only imposed new and stringent conditions upon appellant's use and enjoyment of its property but would also charge appellant with responsibility for fugitive water under penalty of denying appellant any use and enjoyment of its property as a mine. While appellant

limited to drainage discharged from the mine being worked. The Board would now rewrite this to say that it applies to any discharge. incidental to the mining operation regardless of whether it came from the mine or elsewhere. This . . . change in the law . . . must be made by the Legislature through Amendment and not by this Adjudication." This is equally applicable where the discharge is of fugitive water from an adjoining mine or pool.

[14] See note 8, *supra*.

in the use and enjoyment of its property is subject to reasonable exercise of the police power, *Bortz Coal Company v. Commonwealth,* 2 Pa. Commonwealth Ct. 441, 279 A. 2d 388 (1971), the exercise of the police power becomes unreasonable and constitutionally violative of appellant's property rights when it imposes upon appellant a burden unrelated to its otherwise lawful operation over the years and not of its making. No matter how meritorious the desired results may be, the use and enjoyment of property by its owner should not be burdened or impaired in the name of public health, safety or welfare absent a rational relationship between the evil sought to be cured and the use of property as contributing to the evil. It is at this point that curing the evil should be assumed as a direct responsibility of government[15] and not placed upon the property owner in the guise of an exercise of the police power.[16] See *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S. Ct. 158, 67 L. Ed. 322 (1922).

"In ascertaining the intention of the Legislature in the enactment of a law, the courts may be guided by the following presumptions among others: . . . (3) that the Legislature does not intend to violate the Constitution of the United States or of this Commonwealth; . . . ." Act of May 28, 1937, P. L. 1019, Art. IV, §52, 46 P.S. §552. Where a statute can be given two constructions, one of which will render it constitutional

---

[15] See note 11, *supra.*

[16] We hold that the pumping conducted by appellant does not render him any more liable for the polluted quality of the water pumped. There is undisputed testimony that, if the active deep mine discontinued operation and were sealed, some polluted water originating in the Irwin Basin pool would be discharged untreated from gravity flows outside the Hutchinson Mine. The Commonwealth has attempted to place the burden of removing natural pollution and permitted industrial pollution upon appellant without a sufficient nexus for the liability.

and the other unconstitutional, the former construction must be invoked. *Dolan v. Linton's Lunch,* 397 Pa. 114, 152 A. 2d 887 (1959); *Evans v. West Norriton Twp. Municipal Authority,* 370 Pa. 150, 87 A. 2d 474 (1952); *Fidelity Philadelphia Trust Co. v. Hines,* 337 Pa. 48, 10 A. 2d 553 (1940). The clear unconstitutionality of the Board's interpretation lends compelling strength to this Court's holding. In any event, our interpretive approach is clear. Accordingly, we issue the following:

### ORDER

AND Now, this 18th day of January, 1972, the order of the Sanitary Water Board dated November 20, 1970 refusing issuance of mine drainage permits to Pittsburgh Coal Company for its Hutchinson Mine by Application No. 468M024 is reversed; and the matter is remanded to the Department of Environmental Resources as successor to the Sanitary Water Board with the directive to issue the drainage permit in accordance with this opinion.

---

DISSENTING OPINION BY JUDGE MENCER:

I respectfully dissent. As the majority so aptly points out, "[t]he appellant concedes that the 2.17 million gallons of water per day coming from the inactive mines in the Irwin Basin which it discharges from its Hutchinson Mine is polluted with an iron and acid content substantially in excess of the maximum acceptable quality standard set by the Sanitary Water Board. Moreover, appellant does not contend that this discharged water would not be injurious to the public health, animal or aquatic life or to the use of the water for domestic or industrial consumption or recreation." Therefore, these undisputed facts, coupled with the clear language of Section 315(b) of the Clean Streams Law,

Act of August 23, 1965, P. L. 372 (effective January 1, 1966), compels me to the sole conclusion that, when the "discharge from the mine," encompassing acid mine drainage from whatever source, contains concentrations of acid or iron in excess of the reasonable limits properly established by the Sanitary Water Board, a mine drainage permit "shall not be issued." To qualify for the permit under the circumstances prevailing in this case, the appellant's plan of drainage must include the treatment of the 2.17 million gallons of polluted water per day which originates in the Irwin Basin.

One must recognize that the Legislature, in enacting the Clean Streams Law of 1965, was concerned with pollution of the waters of the Commonwealth. Consequently, it is the discharge of the polluted waters into the stream that is critical and not the source of the polluted waters. I therefore find no merit in appellant's assertion that it is free from any responsibility for any polluted water draining into the Hutchinson Mine, since appellant is intentionally and of its own volition *discharging* that deleterious mine drainage into the waters of the Commonwealth.

Appellant asserts that the Sanitary Water Board's refusal to grant it a permit imposes liability on it for the polluted water caused by other mine operators and, moreover, imposes such liability retroactively. I cannot agree with this assertion. Here neither appellant nor the prior operators of the inactive mines in the Irwin Basin are responsible for treatment of the polluted mine drainage coming from the Irwin Basin as long as this water is not discharged from a mine with injurious consequences as defined in Section 315 of the Clean Streams Law as amended in 1965. No liability attached for the past operations which resulted in the water in the Irwin Basin becoming polluted. Nor is appellant accountable for any discharge of polluted

water prior to January 1, 1966, which was the effective date of the 1965 Clean Streams Law. It is the *present pumping* by appellant at the Hutchinson Mine which results in a *present discharge* of polluted water from that mine into the waters of the Commonwealth which constitutes the current condition which justifies the Board's refusal to grant a permit to appellant. The present pumping is not tied in any way to the past or attributable to prior operators of the inactive mines of the Irwin Basin. The requirement that appellant treat the polluted water which it is *now discharging* from its Hutchinson Mine does not render the provisions of the 1965 Clean Streams Law retroactive.

Nor do I believe that *Pennsylvania Coal Company v. Sanderson,* 113 Pa. 126, 6 A. 453 (1886) controls here. In that case, the coal company pumped mine water to the surface, where it joined a flow of water from the drift mouth and then ran by an artificial water course into a stream. The complaint alleged that the coal company polluted the stream and thereby rendered the water totally unfit for domestic and household use and, in addition, alleged that the fish in the stream had been killed. The Supreme Court held that every man has a right to the natural use and enjoyment of his own property and if, while lawfully in such use and enjoyment, without negligence or malice on his part, an unavoidable loss occurs to his neighbor, it is *damnum absque injuria.* However, the Commonwealth is not restricted by this rule of *damnum absque injuria* or by any balancing of equities or by any question of possible prescriptive rights for, no matter how long continued, stream polluters can acquire no prescriptive or property rights to pollute as against the Commonwealth. *Pennsylvania R. R. Co. v. Sagamore Coal Co.,* 281 Pa. 233, 126 A. 386 (1924), cert. den. 267 U.S. 592 (1925);

428

*Commonwealth ex rel. Shumaker v. New York and Pennsylvania Company, Inc.,* 367 Pa. 40, 79 A. 2d 439 (1951).

I am not persuaded that the instant case is ruled by the Guideline provisions published by the Department of Health in its Mine Drainage Manual, Second Edition. Appellant contends Guidelines §§IV-A-3 and IV-A-4 are relevant to this case. My study of these particular Guidelines convinces me that neither is applicable to the factual situation here. Guideline 3 pertains to either (1) a situation where the operations of an active mine intercept mine water pools which would discharge at a point other than the discharge point used by the operator of the active mine or (2) a situation where drainage of an active mine flows to a common pool. Guideline 4 pertains to mining requiring the pumping or draining of adjacent inactive mines to protect the active mine operations. The factual situation in the instant case is that the active mine, but not as a result of any of its operations, receives polluted mine water which would not discharge at a point other than that proposed by the active mine operator. Such water would merely fill up the active mine unless removed from the active mine by pumping. Also, there is no pumping here of adjacent inactive mines in order to protect the active mine operations.

Neither can I accept the majority's ingenious theory that the 2.17 million gallons of water per day coming from the inactive mines in the Irwin Basin are "waters of the Commonwealth" since this water has been a part of an underground lake. Section 1 of the Clean Streams Law of 1965 defines "waters of the Commonwealth" to include "any and all rivers, streams, creeks, rivulets, lakes, dammed water, ponds, springs, and all other bodies of surface and underground water, or parts thereof, whether natural or artificial, within or on the boundaries of this Commonwealth." My analysis of this definition does not persuade me that the waters in

the inactive mines in the Irwin Basin are "waters of the Commonwealth." If this be true, the majority's entire premise evaporates, since it has concluded that polluted waters of the Commonwealth in an underground lake cannot pollute other waters of the Commonwealth flowing in a surface stream. However, even if the factual situation here satisfied the definition, I am still uncertain how this would require the issuance of a permit when Section 315(b) of the Act states in part: "A permit shall not be issued if the board shall be of the opinion that the discharge from the mine would be or become inimical or injurious to the public health, animal or aquatic life, or to the use of the water for domestic or industrial consumption or recreation. . . ."

I would affirm the order of the Sanitary Water Board in this case.

Judge KRAMER joins in this dissent.