## Sanitary Water Board v. Harmar Coal Company

*William M. Gross,* for appellant.

*Harold R. Schmidt,* for respondent.

WILKINSON, J., (Commonwealth Court, Specially Assigned), August 20, 1970.—This matter is before the court on an appeal from the adjudication of the Sanitary Water Board (board) disapproving the application of Harmar Coal Company (appellant) for a new mine drainage permit at its Indianola discharge located in Indiana Township, Allegheny County, being application no. 467M064 at docket no. 68-12.

The board in its adjudication points out that this is a case of first impression. As correctly stated by the board:

"These questions deal with the extent to which a mine operator should be responsible under the Clean Streams Law for the treatment of mine wastes which the operator pumps from an adjacent inactive mine to protect the operator's active workings."

It might be added that the operator does not own and never operated the adjacent mine.

While the question is one of first impression to the board, its enforcement personnel of the Department of Health clearly anticipated this very problem. Indeed, the department published guidelines to assist the mine operators to make plans so as to be in compliance with the law and regulations. Section IV-A-4 of these guidelines states:

"4. Mining requiring the pumping or draining of adjacent inactive mines to protect the active workings.

"The operator(s) will be required to meet Board requirements for drainage from his active mine as well as the pollutional increment in excess of the estimated Base Waste Load* resulting from changes in the drainage pattern in the inactive mine. The maximum limitation would be the Base Waste Load* or the standards set by the Board, whichever is higher.

"*Base Waste Load is the normal waste load originating without pumping or change in drainage pattern from one or more inactive mines as determined by the Board."

We do not need to determine whether these guidelines have the same force and effect as published rules and regulations of the board. As shown by applicant's exhibit 10, the board accepted the department's recommendations, and *by formal action* of the board at a meeting on February 16-17, 1966, it *unanimously* adopted a resolution adopting the guidelines. Indeed, treated as the Department of Health's and the board's

interpretation of the law, this might make the guidelines not only persuasive in general but as binding on the board until the law is changed. See Marmer v. Pennsylvania Public Utility Commission, 190 Pa. Superior Ct. 436 (1959).

Since the law, as we see it, supports the guidelines as announced by the Department of Health and adopted by the board, then the sole issue before the board was whether the pumping of the water from the abandoned mine increased the base waste load. The board made the following three findings on this point:

"6. The pumping at Indianola substantially changes the drainage pattern of the water flowing into the Indianola Mine.

"7. If the pumping at Indianola were to cease there would no longer be a discharge at the site of the pumped discharge of the same, or substantially the same, quantity or quality as the pumped discharge.

"8. If the pumping at Indianola were to cease, any water which may ultimately flow from the Indianola Mine would improve in quality with the passage of time."

Without here quoting all the testimony on these points, we do not feel that the evidence of the commission complies with the express requirement of the Administrative Agency Law of June 4, 1945, P. L. 1388, sec. 44, 71 PS §1710.44, that "any finding of fact made by the agency and necessary to support its adjudication . . . (be) supported by substantive evidence."

The conclusion that, if permitted to remain in the mine, the water might improve in quality before it flowed naturally into the same stream was highly speculative, both as to whether it would ever occur and, if ever, when. For example, the witness upon whom the board seemed to rely most heavily at the

hearing on March 18, 1969, had made a formal written report on February 18, 1969, after a field investigation. At that time, he had the benefit of the testimony of the first hearing on September 20, 1968. This report was offered by the board as exhibit 3. This witness simply concludes in the written report that the discharge from Indianola into Deer Creek would be less if the pumping were stopped and the quality would improve. He did not state how much less nor did he say how long it would take to have the quality improve until it met standards. He testified he had not made tests or calculations to determine these critical points.

The commission in this adjudication attempts to rewrite the provisions of the Clean Streams Act of June 22, 1937, P. L. 1987, as amended, wherein it clearly refers to the restrictions applicable to coal mine operators as being limited to drainage discharged from the mine being worked. The board would now rewrite this to say that it applies to any discharge incidental to the mining operation regardless of whether it came from the mine or elsewhere. This may be a desirable change in the law, but it must be made by the legislature through amendment and not by this adjudication.

The board refers to the fact that the pumping changes the natural drainage pattern in that the flow is at an increased rate at a given point. This must necessarily be true for any pumping operation; indeed, it is the very reason for the pumping. It is significant here that the violation alleged is the iron content of the discharge being above the permitted levels. Indeed, no aquatic study has been made by the board! It is not charged that the increase of the flow makes the aquatic life less possible to survive. Board finding no. 4 is:

"The discharge from the Indianola Mine results in an iron concentration in the receiving stream in excess of standards approved by the Board."

Appellant's clear evidence was that this would have resulted without the pumping. The board's evidence contra was most speculative.

The recent case of Sanitary Water Board v. Sunbeam Coal Corporation, 47 D. & C. 2d 378, 91 Dauph. 70 (1969), contains a clear statement of the history and general basis for the Sanitary Water Board regulating the discharge of mine drainage. In that case it was stated:

"Next, we should consider that in most cases the preliminary determination of being in 'violation' is based upon water samples taken in receiving streams which prove to contain excessive amounts of acid. But, a finding of a 'violation' should not stop at this point, and strict proof of the operator's responsibility thereof ought to be required because of the quasi-penal aspect of the charge and its ultimate effect upon the business of the person charged."

The board's own expert reported to it that if the pumping stopped the Indianola Mine would fill more rapidly than the Harmar Mine and a ground water discharge would result into Deer Creek, the same creek into which the pumping discharges.

After a careful review of all the evidence in this case and after giving due weight to the arguments presented, both orally and in the brief of the able counsel for the board, we cannot find substantive evidence of the clear nature required by the law to support the board's findings of facts 6, 7 and 8. Without these findings, the board's conclusions of law 2 and 3 are not in accord with the board's own interpretation of the Clean Streams Law as expressed in its guidelines. The board's interpretation is in accord with this court's.

Accordingly we make the following

ORDER

And now, August 20, 1970, the appeal of Harmar Coal Company is hereby sustained; the order of the Sanitary Water Board refusing to issue a permit to appellant based on its application no. 467M064 is set aside and the board is directed to issue the permit.