Harmar Coal Co. *v.* Sanitary Water Board.

Argued April 14, 1971, before President Judge Bow-
man and Judges Crumlish, Jr., Kramer, Mencer and
Rogers. Judges Wilkinson, Jr., and Manderino did not
participate.

*Richard B. Springer,* Assistant Attorney General, with him *William M. Gross,* Assistant Attorney General, and *J. Shane Creamer,* Attorney General, for appellant.

*Harold R. Schmidt,* with him *Henry McC. Ingram, Robert S. Barker,* and *Rose, Schmidt & Dixon,* for appellee.

OPINION BY JUDGE CRUMLISH, JR., January 18, 1972:

On March 6, 1970, the Sanitary Water Board issued an adjudication and order denying Harmar Coal Company's application for a permit approving the discharge of untreated mine water from a mine known as the Indianola Mine. Harmar appealed to the Court of Common Pleas of Dauphin County. Section 41 of the Act of June 4, 1945, P. L. 1388, 71 P.S. §1710.41; see *Detwiler v. Sanitary Water Board,* 88 D. & C. 432, 66 Dauph. 104 (1954). On August 20, 1970, that court sustained the appeal and directed the Sanitary Water Board to issue a mine drainage permit for discharges coming from the Indianola Mine. Our brothers WILKINSON and MANDERINO were specially assigned to the Dauphin County Court and participated in the decision of this case. Judge WILKINSON wrote the opinion for that court.

On August 20, 1970, the Sanitary Water Board had thirty days within which to appeal from that decision to the Superior Court, Section 45 of said Act (71 P.S. §1710.45). However, within the thirty-day period, i.e., on September 11, 1970,[1] the "Appellate Court Jurisdiction Act of 1970," Act of July 31, 1970, P. L.    , No. 223, 17 P.S. §§211.101 et seq., became effective. Article V, §509(a)(4) of that Act (17 P.S. §211.509(a)(4)), repealed absolutely all of Section 45 of the Act of June 4, 1945, P. L. 1388 (71 P.S. 1710.45). This presented the Sanitary Water Board with the problem of where to file its appeal. We conclude that, under the unusual procedural circumstances of this case, it is proper for us to hear this appeal. The Harmar Coal Company has made no objection and we believe the language of Section 402(3) of the Act of July 31, 1970, P. L.    , No. 223 (17 P.S. §211.402(3)), lends support to this conclusion. Likewise, under the peculiar situation here, an appeal to the Supreme Court would not seem to lie under Sections 202, 203 or 204 of Article II of that Act (17 P.S. §§211.202-204).

Harmar Coal Company (appellee) is the owner and operator of a coal mine known as the Harmar Mine, which mine produces high-quality metallurgical coal for use in the steel industry. Immediately adjacent to, and directly to the east and north of, the Harmar Mine is an abandoned mine known as the Indianola Mine. These two mines are separated by a barrier of coal, preventing any passage of water between them.

The Indianola Mine was abandoned by Republic Steel Corporation in 1957. The accumulation of water

---

[1] Section 510 of the Act (17 P.S. §211.510) provided that the Act should take effect ten days after final enactment or ten days after the Governor issued the proclamation specified in The Commonwealth Court Act, whichever was later. The Governor's proclamation of September 1, 1970, proved to be the later.

in the Indianola Mine after Republic Steel Corporation ceased pumping posed a potential threat to the Harmar Mine and its miners. Water in the Indianola Mine might create sufficient hydrostatic pressure against the barrier between the two mines to cause the barrier to give way and thereby allow the Indianola water to inundate the Harmar workings. This possibility was considered a sufficient threat by the Department of Mines and Mineral Industries for it to require that appellee pump the water from the Indianola Mine before it accumulates into an underground lake of a magnitude as to endanger the barrier between the two mines and, more importantly, the miners working in the Harmar Mine.

Consequently, appellee made an agreement with the Northeast Industrial District, Inc., authorizing the pumping of water from the Indianola Mine. Appellee obtained a permit from the Department of Health to discharge the water into Deer Creek and began pumping in 1958. With the further amendment of the Clean Streams Law, Act of June 22, 1937, P. L. 1987, 35 P.S. §§691.1 et seq., by the Act of August 23, 1965, P. L. 372, the classification of the waters of the Commonwealth as "clean" and "unclean" in Sections 310-313 was eliminated. The policy of the Commonwealth became not only the protection of the purity of "clean" streams, but also the improvement of "unclean" streams to an unpolluted condition. Therefore, appellee was required to submit an application for a permit under Section 315 of the Act as amended (35 P.S. §691.315). The present application submitted by appellee sought to obtain permission to pump 6.48 million gallons of mine drainage water per day from the inactive Indianola Mine and discharge it, without treatment, into Deer Creek, a tributary of the Allegheny River. The application was not approved by the Department of Health

and appellee requested and received a hearing before the Sanitary Water Board which, on March 6, 1970, issued an adjudication and order disapproving the application and directing appellee to cease operation of the Harmar Mine no later than ninety days from receipt of the order. On April 16, 1970, pursuant to a stipulation of counsel, a supersedeas to the order of March 6, 1970, was granted by the Court of Common Pleas of Dauphin County.

The merits of the adjudication by the Sanitary Water Board were very ably set forth in the opinion of Judge WILKINSON, specially presiding below, in which he reversed the Board. We, therefore, with the addition of one footnote, adopt that opinion as follows:

"This matter is before the Court on an appeal from the Adjudication of the Sanitary Water Board (hereinafter referred to as the Board) disapproving the Application of Harmar Coal Company (hereinafter referred to as the Appellant) for a new Mine Drainage permit at its Indianola discharge located in Indiana Township, Allegheny County, being Application No. 467M064 at Docket No. 68-12.

"The Board in its Adjudication points out that this is a case of first impression. As correctly stated by the Board: 'These questions deal with the extent to which a mine operator should be responsible under the Clean Streams Law for the treatment of mine wastes which the operator pumps from an adjacent inactive mine to protect the operator's active workings.' Adjudication page 2. It might be added that the operator does not own and never operated the adjacent mine.

"While the question is one of first impression to the Board, its enforcement personnel of the Department of Health clearly anticipated this very problem. Indeed, the Department published Guidelines to assist the mine operators to make plans so as to be in compliance with

the law and regulations. Section IV-A-4 of these Guidelines states:

" '4. Mining requiring the pumping or draining of adjacent inactive mines to protect the active workings.

" 'The operator(s) will be required to meet Board requirements for drainage from his active mine as well as the pollutional increment in excess of the estimated Base Waste Load* resulting from changes in the drainage pattern in the inactive mine. The maximum limitation would be the Base Waste Load or the standards set by the Board, whichever is higher.' We do not need to determine whether these Guidelines have the same force and effect as published rules and regulations of the Board. As shown by Applicant's Exhibit 10, the Board accepted the Department's recommendations, and *by formal action* of the Board at a meeting on February 16-17, 1966, it *unanimously* adopted a resolution adopting the Guidelines. Indeed, treated as the Department of Health's and the Board's interpretation of the law, this might make the Guidelines not only persuasive in general but as binding on the Board until the law is changed. See Mariner v. Pennsylvania Public Utility Commission, 190 Pa. Superior Ct. 436 (1959).

"Since the law, as we see it, supports the Guidelines as announced by the Department of Health and adopted by the Board, then the sole issue before the Board was whether the pumping of the water from the abandoned mine increased the Base Waste Load. The Board made the following three findings on this point:

" '6. The pumping at Indianola substantially changes the drainage pattern of the water flowing into the Indianola Mine.

---

'*Base Waste Load is the normal waste load originating without pumping or change in drainage pattern from one or more inactive mines as determined by the Board.'

" '7. If the pumping at Indianola were to cease there would no longer be a discharge at the site of the pumped discharge of the same, or substantially the same quantity or quality as the pumped discharge.

" '8. If the pumping at Indianola were to cease, any water which may ultimately flow from the Indianola Mine would improve in quality with the passage of time.' Without here quoting all the testimony on these points we do not feel that the evidence of the Commission complies with the express requirement of the Act of June 4, 1945, P. L. 1388, Section 44, 71 P.S. 1710.44 that 'any finding of fact made by the Agency and necessary to support its adjudication . . . (be) supported by substantial evidence.'

"The conclusion that, if permitted to remain in the mine, the water might improve in quality before it flowed naturally into the same stream was highly speculative, both as to whether it would ever occur and, if ever, when. For example, the witness upon whom the Board seemed to rely most heavily at the hearing on March 18, 1969, had made a formal written report on February 18, 1969, after a Field Investigation. At that time he had the benefit of the testimony of the first hearing on September 20, 1968. This report was offered by the Board as Exhibit 3. This witness simply concludes in the written report that the discharge from Indianola into Deer Creek would be less if the pumping were stopped and the quality would improve. He did not state how much less nor did he say how long it would take to have the quality improve until it met standards. He testified he had not made tests or calculations to determine these critical points.

"The Commission in this Adjudication attempts to rewrite the provisions of the Clean Streams Law wherein it clearly refers to the restrictions applicable to coal mine operators as being limited to drainage discharged

from the mine being worked. The Board would now re-write this to say that it applies to any discharge incidental to the mining operation regardless of whether it came from the mine or elsewhere. This may be a desirable change in the law** but it must be made by the Legislature through Amendment and not by this Adjudication.

"The Board refers to the fact that the pumping changes the natural drainage pattern in that the flow is at an increased rate at a given point. This must necessarily be true for any pumping operation—indeed, it is the very reason for the pumping. It is significant here that the violation alleged is the iron content of the discharge being above the permitted levels. Indeed, no aquatic study has been made by the Board! It is not charged that the increase of the flow makes the aquatic life less possible to survive. Board Finding No. 4 is: 'The discharge from the Indianola Mine results in an iron concentration in the receiving stream in excess of standards approved by the Board.' The Appellant's clear evidence was that this would have resulted without the pumping. The Board's evidence contra was most speculative.

"The recent case of Sanitary Water Board v. Sunbeam Coal Corporation, 91 Dauphin 70 (1969) contains a clear statement of the history and general basis for the Sanitary Water Board regulating the discharge of mine drainage. In that case it was stated: 'Next, we should consider that in most cases the preliminary determination of being in "violation" is based upon water samples taken in receiving streams which prove to contain excessive amounts of acid. But, a finding of a "violation" should not stop at this point, and strict

---

** See our discussion as to the constitutionality of such a provision in *Pittsburgh Coal Co. v. Sanitary Water Board*, filed this same day.

proof of the operator's responsibility thereof ought to be required because of the quasi-penal aspect of the charge and its ultimate effect upon the business of the person so charged.' The Board's own expert reported to it (Board Exhibit 3) that if the pumping stopped the Indianola Mine would fill more rapidly than the Harmar Mine and a ground water discharge would result into Deer Creek, the same creek into which the pumping discharges.

"After a careful review of all the evidence in this case and after giving due weight to the arguments presented, both orally and in the brief of the able Counsel for the Board, we cannot find substantive evidence of the clear nature required by the law to support the Board's Findings of Facts 6, 7 and 8. Without these Findings, the Board's Conclusions of Law 2 and 3 are not in accord with the Board's own interpretation of the Clean Streams Law as expressed in its Guidelines. The Board's interpretation is in accord with this Court's."

Affirmed.

---

DISSENTING OPINION BY JUDGE MENCER:

I respectfully dissent. This case presents us with the difficult problem of the extent to which a mine operator is responsible under the Clean Streams Law of 1965 for the treatment of polluted mine water which the operator pumps from an adjacent inactive mine to enable him to operate his own active mine and protect his miners.

The issue is whether Section 315 of the Clean Streams Law of 1965, Act of August 23, 1965, P. L. 372, applies to the fact situation here. I believe that it does. This section is captioned, "Permits for Operation of Coal Mines". Its initial words are: "Before *any* coal mine. . . ." (Emphasis added.) This would clearly

indicate that it was the intention of the Legislature to have this section apply to any coal mine, active or inactive alike. When Section 315 was added by the 1965 amendments, the Act was amended by adding, after Section 3, a new section to read: "Section 4. Findings and Declarations of Policy.—It is hereby determined by the General Assembly of Pennsylvania and declared as a matter of legislative findings that:

"(1) The Clean Streams Law as presently written has failed to prevent an increase in the miles of polluted water in Pennsylvania.

"(2) The present Clean Streams Law contains special provisions for mine drainage that discriminate against the public interest.

"(3) Mine drainage is the major cause of stream pollution in Pennsylvania and is doing immense damage to the waters of the Commonwealth.

"(4) Pennsylvania, having more miles of water polluted by mine drainage than any state in the nation, has an intolerable situation which seriously jeopardizes the economic future of the Commonwealth.

"(5) Clean, unpolluted streams are absolutely essential if Pennsylvania is to attract new manufacturing industries and to develop Pennsylvania's full share of the tourist industry, and

"(6) Clean, unpolluted water is absolutely essential if Pennsylvanians are to have adequate out of door recreational facilities in the decades ahead.

"The General Assembly of Pennsylvania therefore declares it to be the policy of the Commonwealth of Pennsylvania that:

"(1) It is the objective of the Clean Streams Law not only to prevent further pollution of the waters of the Commonwealth, but also to reclaim and restore to a clean, unpolluted condition every stream in Pennsylvania that is presently polluted, and

"(2) The prevention and elimination of water pollution is recognized as being directly related to the economic future of the Commonwealth."

The foregoing statement of policy indicates that the Legislature intended to deal directly with the problem of waters of the Commonwealth being affected by polluted water resulting from mining operations. Section 315(b) provides, *inter alia,* that "[a] permit shall not be issued if the board shall be of the opinion that the discharge from the mine would be or become inimical or injurious to the public health, animal or aquatic life, or to the use of the water for domestic or industrial consumption or recreation." There is no dispute in the instant case that the discharge from the Indianola Mine is polluting the receiving streams which are waters of the Commonwealth. The Sanitary Water Board so found as one of its findings of fact, the appellee by its application admits it, and there is substantial evidence in the record to support this finding of fact by the Board. The only dispute centers on the appellee's contention that the language of Section 315 is applicable only to active mines and not to inactive mines or, if to inactive mines, then only to those owned by the applicant. Under the facts of this case I do not believe that the discharge from the Indianola Mine can be separated from the operation of the Harmar Mine. The sole reason that polluted water is being pumped from Indianola into the receiving streams is so that the Harmar Mine can operate. If pumping stopped, so would the operation of the Harmar Mine, because it would no longer be safe for miners to go into the Harmar Mine. The discharge of water from the Indianola Mine is absolutely essential to, and an integral vital part of, the operation of the Harmar Mine and accordingly must be subject to the issuance of a permit and the approval of a drainage plan, as required by the provisions of

Section 315 which govern the operation of any coal mine.

I am in accord with that portion of the Board's adjudication that reads as follows: "Although the mine water pumped from Indianola does not come directly from the Harmar mine, it is the operation of the Harmar mine which results in the discharge from Indianola. The pumping of the water from Indianola changes significantly the natural drainage pattern. Increasing the rate of flow at a given point and concentrating the discharge at a given point are two immediate results of pumping, each of which tend to heighten the adverse effect of any pollutional load contained in the discharge. Pumping also prevents the stabilization of the water flowing through underground workings and prolongs the time required for a natural improvement of the water being discharged. We therefore conclude that the discharge from Indianola is subject to regulation under the Clean Stream Law."

The Division of Sanitary Engineering, Pennsylvania Department of Health, published and circulated a Mine Drainage Manual on June 1, 1966 which stated on its cover and title pages that it was a guide for the preparation of applications, plans of drainage and reports on bituminous deep and anthracite mines. The appellee and the Sanitary Water Board do not share a common understanding as to the meaning or effect of these guidelines. I do not consider them to be equivalent to rules and regulations of the Department of Health and, even if they were to be so considered, they were entitled to little, if any, consideration without the approval of the Department of Justice, pursuant to the then applicable Administrative Agency Law, June 4, 1945, P. L. 1388, §21, as amended by the Act of June 26, 1963, P. L. 180, 71 P.S. §1710.21. More important, the power of an administrative agency to prescribe rules and regula-

tions under a statute is not the power to make law, but only the power to adopt regulations to carry into effect the will of the Legislature as expressed by statute. *Volunteer Firemen's Relief Association of City of Reading v. Minehart*, 425 Pa. 82, 227 A. 2d 632 (1967); *Commonwealth v. American Ice Co.*, 406 Pa. 322, 178 A. 2d 768 (1962). Here the guidelines in question were merely statements of policy and suggestions to mine operators relative to the preparation of applications for permits.

Although there was disputed testimony pertaining to the Board's findings of fact Nos. 6, 7 and 8, the record discloses substantial evidence in support of the first five findings of fact, which are the essential findings here. These include the findings that, in order to insure the safety of the workers in the Harmar Mine, the applicant pumps mine water from an adjacent inactive mine (the Indianola Mine); that the applicant's discharge from the Indianola Mine enters Deer Creek, a tributary of the Allegheny River, and is a discharge of approximately five million gallons of water per day, containing an iron concentrate in excess of seven milligrams per litre, the maximum concentration allowed under Board standards; that the discharge from the Indianola Mine results in an iron concentration in the receiving stream in excess of standards approved by the Board; and that the discharge from the Indianola Mine is polluting the receiving streams.

My examination of the record convinces me that there is substantial evidence to support these crucial findings of fact and that, in turn, they support the Board's conclusions of law, including that the applicant's discharge of untreated mine water from the Indianola Mine can be approved only if it meets Board standards and does not pollute the receiving streams. The Sanitary Water Board here has the responsibility

to determine factual matters. *McAllister Unemployment Compensation Case,* 197 Pa. Superior Ct. 552, 180 A. 2d 121 (1962).

I would reverse the order of the Court of Common Pleas of Dauphin County.

Judge KRAMER joins in this dissent.