Commonwealth, Appellant, *v.* Harmar Coal Company.
Commonwealth, Appellant, *v.* Pittsburgh Coal Company.

78

Argued May 25, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY and NIX, JJ.

reargument refused July 23, 1973.

*Stanley R. Wolfe*, Special Assistant Attorney General, with him *K. W. James Rochow and William M. Cross*, Assistant Attorneys General, and *J. Shane*

*Creamer,* Attorney General, for Commonwealth, appellant.

*Harold R. Schmidt,* with him *K. Leroy Irvis, Henry McC. Ingram, Edmund M. Craney, Michael W. Balfe,* and *Rose, Schmidt and Dixon,* for appellee.

*John D. Killian, Curtin Winsor,* and *Killian & Gephart,* for Pennsylvania Environmental Council, Inc., Pennsylvania Federation of Sportsmen's Clubs, Inc., Pennsylvania State Council of Trout Unlimited and League of Women Voters of Pennsylvania, amici curiae.

*Daniel J. Snyder, III,* Regional Counsel, with him *James J. Seeley,* Assistant Regional Counsel, *Jacob P. Hart,* Director, Enforcement Division, The Environmental Protection Agency, Region III, for United States Environmental Protection Agency, amicus curiae.

OPINION BY MR. CHIEF JUSTICE JONES, March 16, 1973:

These appeals raise vital questions concerning the power of the Commonwealth's Department of Environmental Resources to control and eliminate water pollution. Although the procedural history of each appeal differs, both appeals raise similar legal issues and, therefore, are considered in one opinion.

On March 6, 1970, the Sanitary Water Board of the Commonwealth of Pennsylvania (Board) issued an adjudication and order denying Harmar Coal Company's (Harmar) application for a mine drainage permit approving the discharge of untreated acid mine drainage from the Indianola Mine. The Court of Common Pleas of Dauphin County, on August 20, 1970, reversed the Board's order and directed the Board to issue the permit. *Sanitary Water Board v. Harmar Coal Co.,* 50 Pa. D. & C. 2d 627 (1970). The Board appealed to the Commonwealth Court.

Pittsburgh Coal Company's (Pittsburgh) application for a mine drainage permit for the discharge of untreated acid mine drainage from its Hutchinson Mine was similarly denied by the Board on November 20, 1970. Unlike Harmar, Pittsburgh appealed directly to the Commonwealth Court.

On January 18, 1972, the Commonwealth Court filed separate opinions in both cases.[1] In *Harmar Coal Co. v. Sanitary Water Board*, 4 Pa. Commonwealth Ct. 435, 285 A. 2d 898 (1972), the Court adopted the lower court's opinion and affirmed the issuance of the permit. In *Pittsburgh Coal Co. v. Sanitary Water Board*, 4 Pa. Commonwealth Ct. 407, 286 A. 2d 459 (1972), the Court reversed the Board's refusal to issue the permit and directed the Department of Environmental Resources[2] to issue the permit as requested. We granted allocaturs.

The factual posture of these cases is set forth in detail in the Commonwealth Court opinions; for our purposes, a brief summary of the facts is sufficient. Adjacent to the Harmar Mine is the abandoned Indianola Mine. Although a coal barrier separates the two

---

[1] The Commonwealth Court voted three to two to permit the issuance of the permits in both cases. Judges WILKINSON and MANDERINO, having been specially assigned to the Dauphin County Court of Common Pleas and having participated in that court's decision in the *Harmar* case, did not participate in either of these cases when they were appealed to the Commonwealth Court. Judge MENCER, joined by Judge KRAMER, wrote dissenting opinions in both cases.

[2] The Sanitary Water Board was abolished by Section 30 of the Act of December 3, 1970, P. L. 834, creating the Department of Environmental Resources. "All orders, permits, regulations, decisions and other actions of . . . [the] board . . . remain in full force and effect" under Section 34 of the same act, however, "until modified, repealed, suspended, superseded or otherwise changed by appropriate action of the agency assuming the applicable powers and duties. . . ." Under Section 30(a), this agency is now the Department of Environmental Resources, and references hereafter made to the Board should be construed as now applicable to the Department of Environmental Resources.

mines, the accumulation of water in the Indianola Mine threatens the Harmar Mine and the safety of its miners: the accumulating water might create sufficient hydrostatic pressure against the barrier to cause it to give way and flood the Harmar Mine. In order to make its mine safe for operation, Harmar must pump 6.48 million gallons per day of untreated acid mine drainage[3] from the Indianola Mine and discharge it into the Deer Creek, a tributary of the Allegheny River. Pittsburgh's Hutchinson Mine is the last operating deep mine in a large coal basin. As a result of ground water accumulating in the abandoned mines, a large underground pool has formed in the basin. A barrier of coal separating the Hutchinson mine from the adjacent mines in the basin is unable to protect the Hutchinson Mine from intruding fugitive water as it travels to gravity discharges. In order to operate the mine Pittsburgh must discharge 3.44 million gallons per day of acid mine drainage—including the 2.17 million gallons that finds it way into the Hutchinson Mine from the basin. In its application for a permit Pittsburgh proposed to treat only the 1.27 million gallons per day of acid mine drainage originating in the Hutchinson Mine. Both Pittsburgh and Harmar admit that the discharge contains iron and acid concentrations in excess of the maximum established by the Board.

The broad question presented is whether the Sanitary Water Board under the Clean Streams Law[4] can

---

[3] Acid mine drainage is polluted water. Pollution occurs in mine water as a result of iron and acid salts being dissolved in it. The iron and acid salts are formed on the surface of coal measure exposed to the mine atmosphere, and not the coal measure under water. The air causes pyritic material in the exposed coal to oxidize, forming iron and acid salts which are then washed into the mine water, causing pollution.

[4] Act of June 22, 1937, P. L. 1987, *as amended* by the Act of May 8, 1945, P. L. 435, 35 P.S. §691.1 *et seq.* (herein sometimes referred to as the "1945 Amendments"); *as amended* by the Act of

require that Harmar *treat* the discharge of acid mine drainage purged from an adjacent, inactive mine and require that Pittsburgh *treat* its entire discharge from its Hutchinson Mine even though some of the drainage flows into its mine from adjacent inactive mines.

In order to understand and appreciate what the present Clean Streams Law intended to accomplish, the legislative history of acid mine drainage pollution control is enlightening. Prior to the enactment of the original Clean Streams Law (the Act of June 22, 1937, P. L. 1987), acid mine drainage had been specifically excluded from pollution control. (Purity of Waters Act of April 22, 1905, P. L. 260, §4, and the Act of June 14, 1923, P. L. 793, §1). Section 310 of the 1937 Act dealt specifically with acid mine drainage as follows: "The provisions of this article shall not apply to acid mine drainage and silt from coal mines *until such time as, in the opinion of the Sanitary Water Board, practical means for the removal of the polluting properties of such drainage shall become known.*" (Emphasis added.) In the 1945 Amendments Section 310 was

---

August 23, 1965, P. L. 372 (herein sometimes referred to as the "1965 Amendments") ; *as amended* by the Act of July 31, 1970, P. L. 653, 35 P.S. §691.1 *et seq.* (1972 Supplement—herein sometimes referred to as the "1970 Amendments"). It appears that prior to the instant appeals only the 1965 form of the Clean Streams Law was applied. Since Section 20 of the 1970 Amendments provides "this Act shall take effect immediately," the applicable statute is the Clean Streams Law *as amended* by the Act of July 31, 1970, even though our result would be the same under the 1965 Amendments. The United States Supreme Court stated in *Thorpe v. Housing Authority*, 393 U.S. 268, 281 (1968), where there had been a change in a federal administrative regulation: "The general rule, . . . is that an appellate court must apply the law in effect at the time it renders its decision [citations omitted]." This rule has also been applied where the change is constitutional, *United States v. Chambers*, 291 U.S. 217 (1934) ; statutory, *Carpenter v. Wabash R. Co.*, 309 U.S. 23 (1940) ; or judicial, *Vanderbach v. Owens-Illinois Glass Co.*, 311 U.S. 538 (1941).

modified by requiring the Board to protect certain clean waters by regulation, but permitted the continuing pollution of already polluted waters. As in the 1937 Act, except for the discharge into certain clean waters, acid mine drainage was to remain exempt from regulation until there was a practical means, in the Board's opinion, for treating the drainage.

In 1965, the Clean Streams Law was revamped. After many years of pollution, the Legislature, obviously prompted by increasing public awareness and technological advancements, articulated a stronger concern for the environment. A section was added which provided:

"Section 4. Findings & Declarations of Policy.— It is hereby determined by the General Assembly of Pennsylvania and declared as a matter of legislative findings that:

"(1) The Clean Streams Law as presently written has failed to prevent an increase in the miles of polluted water in Pennsylvania.

"(2) The present Clean Streams Law contains special *provisions for mine drainage that discriminate against the public interest.*

"(3) *Mine drainage is the major cause of stream pollution in Pennsylvania,* and is doing immense damage to the waters of the Commonwealth.

"(4) Pennsylvania, having more miles of water polluted by mine drainage than any state in the Nation, has an intolerable situation which seriously jeopardizes the economic future of the Commonwealth.

"(5) *Clean, unpolluted streams are absolutely essential* if Pennsylvania is to attract new manufacturing industries and to develop Pennsylvania's full share of the tourist industry, and

"(6) Clean, unpolluted water is absolutely essential if Pennsylvanians are to have adequate out-of-door recreational facilities in the decades ahead.

"The General Assembly of Pennsylvania therefore declares it to be the policy of the Commonwealth of Pennsylvania that:

"(1) It is the objective of the Clean Streams Law *not only to prevent further pollution of the waters of the Commonwealth, but also to reclaim and restore to a clean, unpolluted condition every stream in Pennsylvania that is presently polluted,* and

"(2) The prevention and elimination of water pollution is recognized as being directly related to the economic future of the Commonwealth." (Emphasis added.) In order to meet these objectives, Section 1 of the Act was amended to include acid mine drainage in the definition of "industrial waste." Thus Section 307 was made applicable, which provided, in part: "No person shall hereafter erect, construct or open, or reopen, or *operate any establishment* which, in its operation, results in the discharge of *industrial wastes which would flow or be discharged into any of the waters of the Commonwealth and thereby cause a pollution of the same,* unless such person shall first provide proper and adequate treatment works for the treatment of such industrial wastes, approved by the board. . . ."

In addition, Section 315(a) of the 1965 Amendments required the mine operator, as a condition of mining, to apply "for a permit approving the proposed drainage and disposal of industrial wastes . . .," and that, "the application shall contain complete drainage plans. . . ." Section 315(b) prohibited the operation of any coal mine without a permit and set forth the conditions under which a permit was not to be issued: "A permit shall not be issued if the board shall be of the opinion *that the discharge from the mine would be or become inimical or injurious to the public health, animal or aquatic life, or to the use of the water for domestic or industrial consumption or recreation. In issuing a permit the board may impose such conditions as are neces-*

*sary to protect the waters of the Commonwealth.* The permittee shall comply with such permit conditions and with the rules and regulations of the board." (Emphasis added.)

In 1970 the Act was again amended. Section 307 now reads in part: "No person . . . shall discharge or permit the discharge of industrial wastes in any manner . . . into any of the waters of the Commonwealth unless such discharge is authorized by the rules and regulations of the board or such person . . . has first obtained a permit from the department. . . ." Similarly, Section 315(a) now reads in part: "No person . . . shall operate a mine or allow a discharge from a mine into the waters of the Commonwealth unless such operation or discharge is authorized by the rules and regulations of the board or such person . . . has first obtained a permit from the department." It is clear beyond question that the 1970 Amendments extended the Board's control over mining to include regulation of all operations and discharges.[5]

Before determining the applicability of the present Clean Streams Law to the facts of these cases, we shall briefly review the Board's adjudications and the Commonwealth Court's decisions. In denying the applications of Pittsburgh and Harmar the Board applied Section 315 broadly in order to give effect to the "Findings and Declarations of Policy" in Section 4. In *Harmar Coal*, the Board concluded that it could regulate the discharge from the Indianola Mine since it was the operation of the Harmar Mine which resulted in the Indianola discharge. The Board read "discharge from the mine" to refer to "all drainage which flows out of, or is affected by the mining operation." Similarly in *Pittsburgh Coal*, the Board read "discharge from the

---

[5] *See, generally*, Comment, *Statutory Pollution Control in Pennsylvania*, 16 Villanova L. Rev. 851, 865-894 (1971).

mine" to encompass "drainage caused by whatever source," and found that Pittsburgh had not demonstrated that the discharge of the fugitive water would not cause "pollution" to the "waters of the Commonwealth."

The Commonwealth Court, however, determined that the Board in both cases improperly applied the 1965 form of the Clean Streams Law. In *Harmar Coal*, the Court found that the Board erred in not deciding the case according to the guidelines set forth in the Pennsylvania Department of Health Mine Drainage Manual (formulated to aid mine operators in applying for mine permits)[6] and held that the Board's conclusion was contrary to the guidelines. *Harmar Coal Co. v. Sanitary Water Board*, 4 Pa. Commonwealth Ct. at 440-41, 285 A. 2d at 901. In addition, the Court held that the restrictions in the Clean Streams Law, applicable to coal mine operators, were clearly "limited to drainage discharged from the mine being worked," and not applicable to any discharge incidental to the mining operation regardless of whether it came from the mine or elsewhere. *Id.* at 441-42, 285 A. 2d at 901-02.

In *Pittsburgh Coal*, the Commonwealth Court was of the opinion that the Board erred in requiring Pittsburgh to treat "drainage caused by whatever source," and in finding that Pittsburgh had not demonstrated that the discharge of the fugitive water would not cause "pollution" to the "waters of the Commonwealth." *Pittsburgh Coal Co. v. Sanitary Water Board*, 4 Pa.

---

[6] The Department of Health was designated as the enforcement agent of the Sanitary Water Board. The Administrative Code, Act of April 7, 1929, P. L. 177, §2109, 71 P.S. §539. The Board, in Section 2(a) of Article 900 of its Rules and Regulations, designated the Department of Health as the "reporting agency" for bituminous deep mines and all anthracite mines. Pursuant to its delegated responsibilities the Department of Health published a "Mine Drainage Manual."

Commonwealth Ct. at 418, 286 A. 2d at 465. In reversing the Board's order, the Court held that the underground pool already "unclean" with "noxious and deleterious substances" was not intended to be termed as a "noxious and deleterious substance" itself, so as to be classified "pollution" as defined in Section 1 of the 1965 form of the Clean Streams Law. The intent of the Clean Streams Law was that "pollution occurs when noxious and deleterious substances are *first* discharged into any of the 'waters of the Commonwealth,' " 4 Pa. Commonwealth Ct. at 420, 286 A. 2d at 466; therefore, the water from the underground pool, because it had been polluted while underground, could not itself pollute the surface water when it was discharged by Pittsburgh. The Court also held that Pittsburgh was not responsible for all discharges "caused by whatever source," and that, although the Clean Streams Law is concerned with the discharge of "industrial waste," which is defined in Section 1 of the 1965 and 1970 Amendments as including "mine drainage," the polluted water finding its way into the Hutchinson Mine and subsequently discharged into the surface waters was neither mine drainage nor any other type of industrial waste within the meaning of the Clean Streams Law.

We do not agree with the Commonwealth Court's interpretation of the Clean Streams Law in *Harmar Coal*. A careful analysis of Section 315 of the 1965 Amendments reveals that it is illogical to limit the meaning of "discharge from the mine" to "drainage discharged from the mine being worked." Section 315 also required that the application for a mine drainage permit contain "complete drainage plans." In *Versailles Township v. Ulm*, 152 Pa. Superior Ct. 384, 388, 33 A. 2d 265 (1943), the Superior Court held that a municipal improvement is not complete until it is free from deficiency and *not lacking in any essential element*: similarly, a mine drainage plan is incomplete where it

lacks an essential element. The pumping of the mine drainage from the Indianola Mine is essential to the safe operation of the Harmar Mine and is, therefore, a vital part of the complete drainage plan. Harmar indicated that it considered this pumping part of its operation when it applied for the permit. We do not believe that the Legislature intended Section 315 to apply only to discharges from the mine being worked when the same section requires the Board's approval of "complete drainage plans." Moreover, we agree with the dissenters below that the initial words of Section 315, "Before *any* coal mine. . ." (emphasis added), indicate that the Legislature intended the section to apply to *any* coal mine—active or inactive.

It is even clearer from the 1970 Amendments that the Legislature intended that the pumping of mine drainage from an adjacent inactive mine to protect the operator's active mine be regulated by the Board. Section 315, as amended, provides that no one "shall operate a mine or allow a discharge from a mine" without a permit or contrary to the Board's rules and regulations: included in "operation of the mine" is "any other work done on land or water in connection with the mine." The pumping at the Indianola Mine is clearly work done on land in connection with the Harmar Mine and, therefore, part of that mine's operation.

We are also unable to accept the Commonwealth Court's rationale in *Pittsburgh Coal*. Water polluted underground can itself pollute the surface water into which it is discharged. Nothing in the Clean Streams Law justifies the Court's holding that pollution occurs *only* when polluting substances are *"first* discharged into *any* 'waters of the Commonwealth,' " in this case the underground pool. Appellant argues, and we agree, that the critical and principal illegal conduct under the Clean Streams Law is the discharge into the surface waters. The Court below, however, failed to distinguish between pollution of waters, created by min-

ing, which remain underground and those waters which are discharged to the surface. In the Clean Streams Law and the Rules and Regulations thereunder, this distinction is crystal clear. Section 315 of the 1965 Amendments states that a permit would not be issued if in the Board's opinion the discharge from the mine would endanger the "public health, animal or aquatic life, or . . . the use of the water for domestic or industrial consumption or recreation." In the 1970 Amendments this language was deleted. Section 315 now prohibits discharges from mines unless the discharge is authorized by the Board's Rules and Regulations or the mine operator has first obtained a permit. Section 4, Article 900 of the Board's Rules and Regulations, by requiring plans or methods to "show how a pollutional discharge will be prevented from the mine after mining is completed," anticipates and allows the accumulation of polluted water in mine basins as long as it does not reach the surface waters.

We further believe the Commonwealth Court erred in its application of the definition of "industrial waste" and in defining "mine drainage." In holding that the discharge into the surface water of acid mine drainage originating in other mines was not "industrial waste" the Court stated: "[t]*he diverting of this water* from one natural course to another *to enable an industrial pursuit does not make it 'industrial waste' resulting from 'industry'*." 4 Pa. Commonwealth Ct. at 421, 286 A. 2d at 467. (Emphasis added.) The pumping of all the mine drainage from the Hutchinson Mine was necessary to and for the specific purpose of enabling Pittsburgh to conduct its mining operations. The discharge therefore, created by Pittsburgh's industrial pursuit of mining, was industrial waste.[7] To permit this discharge

---

[7] The 1970 Amendments added the following to the definition of "industrial waste". "Industrial waste" shall include all such substances whether or not generally characterized as waste.

to the surface and ignore its essential role in Pittsburgh's mining operation is to promote rather than abate pollution.

As to the definition of "mine drainage," we define it as waters which have been polluted as a result of the operation of a mine. The Commonwealth Court, however, was of the opinion that the fugitive water in this case was no longer mine drainage but rather "the natural flow of 'waters of the Commonwealth'." We believe that, even though the fugitive water is included within the definition of "waters of the Commonwealth,"[8] it is still mine drainage. Mine drainage does not cease to be mine drainage once mining has ceased in the mine from which it continues to drain. The Court's reliance on the Act of December 15, 1965, P. L. 1075, 35 P.S. §760.1 (1972-73 Supplement), was misplaced. Although this Act directs the Secretary of the Department of Mines and Mineral Industries to "initiate an immediate action program to correct pollution from abandoned deep and strip mines . . ." it does not permit a mine operator to discharge untreated acid mine drainage into the surface waters of the Commonwealth, contrary to the Clean Streams Law. It is directed at mines long closed at a time when operators of those mines might not even be known. Nothing in this act requires that the department take action to treat acid mine drainage that has found its way into an active mine and is subsequently discharged therefrom.

In *Pittsburgh Coal,* the Commonwealth Court admitted that the Clean Streams Law was capable of the

---

[8] Section 1 of the Clean Streams Law provides, in part: " 'Waters of the Commonwealth' shall be construed to include any and all rivers, streams, creeks, rivulets, impoundments, ditches, water courses, storm sewers, lakes, dammed water, ponds, springs, and all other bodies or channels of conveyance of surface and underground water, or parts thereof, whether natural or artificial, within or on the boundaries of this Commonwealth."

interpretation presented by the Board but was compelled to construe the law as it did because it believed the Commonwealth's interpretation was unconstitutional. 4 Pa. Commonwealth Ct. at 423, 286 A. 2d at 467-68. The Court held that the Board's interpretation constituted an unreasonable, arbitrary and oppressive exercise of the State's police power, since it denied Pittsburgh the use and enjoyment of its property, unless it treated the entire discharge. The Court was also unable to see any rational relationship between the evil sought to be remedied and Pittsburgh's use of its property as contributing to that evil. As to the constitutionality of the Board's interpretation in *Harmar Coal*, the Court relied on its holding in *Pittsburgh Coal*.

We disagree with the Commonwealth Court's analysis. There is no question as to the constitutionality of either the 1965 or 1970 forms of the Clean Streams Law as applied to these cases. A State in the exercise of its police power may, within constitutional limitations, not only suppress what is offensive, disorderly or unsanitary, but enact regulations to promote the public health, morals or safety and the general well-being of the community. *Bacon v. Walker*, 204 U.S. 311 (1907). This power has been used to prevent industrial practices in the use of private property which were injurious to the public. *The Slaughter House Cases*, 83 U.S. 36 (1872). The police power may even be exercised over property and current business operations, requiring the destruction of existing property, *Miller v. Schoene*, 276 U.S. 272 (1928), or the imposition of new costs, *Queenside Hills Realty Co., Inc. v. Saxl*, 328 U.S. 80 (1946); *The Slaughter House Cases*, 83 U.S. 36 (1872). Regulations maintaining the State's water resources have also been held to be within the scope of the police power. *Hudson County Water Co. v. McCarter*, 209 U.S. 349 (1908); *Commonwealth v. Emmers*, 33 Pa. Superior Ct. 151 (1907), *aff'd*, 221 Pa. 298, 70 A. 762 (1908).

The constitutional standards to apply in determining whether the police power was properly exercised were set forth in *Lawton v. Steele,* 152 U.S. 133, 137 (1894): "To justify the State in . . . interposing its authority in behalf of the public, it must appear, first, that the interests of the public require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals." In applying these standards a regulation must be measured by its "reasonableness," *Goldblatt v. Hempstead,* 369 U.S. 590 (1962). Debatable questions as to "reasonableness" are not for the courts but for the Legislature and therefore the presumption of reasonableness is with the State. *Id.* at 595-96 (citations omitted).

The dangers of acid mine drainage have been noted by the United States Congress, the Pennsylvania Legislature and by the courts. In Section 14 of the Water Pollution Control Act, 33 U.S.C. §1151 (1970), Congress has provided for substantial federal grant assistance to help combat this problem. The Pennsylvania Legislature, in Section 4 of the 1965 Amendments, declared that acid mine drainage, as a major cause of stream pollution, was doing universal damage to the Commonwealth's waters. In *United States v. Jellico Industries,* 3 E.R.C. 1519 (M.D. Tenn. 1971), the court found that the drainage of acid mine water into a surface lake caused irreparable injury to the environment sufficient to support the granting of a permanent injunction against mining activities.[9] In addition, we cannot ignore Article I, Section 27 of the Pennsylvania Constitution, which provides: "*Natural Resources and*

---

[9] The costs and dangers of acid mine drainage are well documented in the Appalachian Regional Commission's Report, *Acid Mine Drainage in Appalachia,* H. R. Doc. 91-180 (91st Cong., 1st Sess. 1969).

*the Public Estate*—The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people." There cannot be any doubt that an overriding public interest in acid mine drainage pollution control does exist.

It is only logical that the way to eliminate pollution and reclaim the Commonwealth's waters is to eliminate or treat *all* the polluting discharges. We find no hardship in imposing the costs of pollution control upon Pittsburgh and Harmar who discharged acid mine drainage into the surface waters of the Commonwealth pursuant to a profit-making enterprise. This is not an extreme case where, in the interest of public health and safety, the owner is prohibited from using his property. *Reinman v. Little Rock,* 237 U.S. 171 (1915). Here the prohibition upon the enterprise of mining is not absolute, but only makes its operation more expensive.[10] *See Pierce Oil Corp. v. City of Hope,* 248 U.S. 498 (1919) ; *The Slaughter House Cases,* 83 U.S. 36 (1872). Therefore, a total treatment requirement would not be unduly oppressive or deny Pittsburgh and Harmar the use and enjoyment of their property.

With regard to the purported lack of relationship between the evil sought to be cured and the appellees' conduct, the Commonwealth Court failed to recognize the obvious nexus between the discharging of the acid mine drainage into the surface waters and the clear

---

[10] In testifying before the Board, Pittsburgh admitted that even if it should be required to treat the entire discharge, it would build the necessary facility and continue to operate the Hutchinson Mine.

legislative intent to not only prevent further pollution but also to restore and reclaim those waters presently polluted. As the dissenters below correctly observed, "it is the discharge of the polluted waters into the stream that is critical and not the source of the polluted waters." 4 Pa. Commonwealth Ct. at 426, 286 A. 2d at 469. It is even clearer in the language of Section 315 (a) of the 1970 Amendments that the Legislature was not concerned with the source of the polluted water for that section provides, in part, that "[n]o person or municipality shall operate a mine or allow a discharge from a mine. . . ." This Court, in *Archbishop O'Hara's Appeal*, 389 Pa. 35, 58, 131 A. 2d 587, 598 (1957), reaffirmed the long-standing notion that "the right to acquire and own property, and to deal with it and use it as the owner chooses, so long as the use harms nobody, is a natural right (citations omitted)." While Pittsburgh and Harmar may not be responsible for polluting all water, they certainly harm the Commonwealth by discharging that water into the surface waters.

The Commonwealth Court cited *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), as authority for holding the Board's interpretation of the Clean Streams Law unconstitutional. *Mahon* is clearly distinguishable. In *Mahon* the United States Supreme Court reviewed a statute that prohibited mining that caused the subsidence of human habitations or public streets. The coal company had conveyed the surface rights to its land but expressly reserved the right to remove the coal beneath the surface and the grantees expressly assumed the risk and waived all rights to damages that might arise from the coal company's mining. The Court held that the statute stretched the police power too far, resulting in a taking of the coal company's property under the Fourteenth Amendment and further ran afoul of the Impairment of Contract Clause of the Constitution. The Court reasoned that the statute had the effect of taking

or destroying the coal company's property for constitutional purposes by making it "commercially impracticable" for it to mine and emphasized that the owner of the surface had assumed this risk and refused to give them greater rights than they purchased.

In the case at bar, the Clean Streams Law only regulates the process to be used in gaining access to the coal and in no way makes coal mining impracticable. There is no existing arrangement between Pittsburgh and Harmar and either private parties or the State that gives them the right to discharge acid mine drainage into the waters of the Commonwealth. Here use of their property by Pittsburgh and Harmar is merely regulated, whereas in *Mahon* property was taken from one party and given to another. Finally, in *Mahon* there was a limited public interest in that the statute forbade mining only where the surface was owned by parties other than the owners of the coal. The Clean Streams Law, however, applies to all mining operations to protect the interest of the public.

It is argued that the refusal to grant a permit in these cases would result in an unconstitutional retroactive application of the present Clean Streams Law in that Pittsburgh and Harmar will be required to treat water polluted before the enactment of the relevant statute and polluted as a result of not only their own past acts but also the acts of other mine operators. We agree with the dissenters below, in *Pittsburgh Coal*, that this assertion is unfounded. The present Clean Streams Law does not attach liability for past operations which resulted in the pollution of the underground water. Pittsburgh and Harmar will only be responsible for the *present pumping* which results in a *present* discharge into the surface waters of the Commonwealth.[11]

---

[11] *See, generally*, Note, Pollution Control Under the Pennsylvania Clean Streams Law, 34 Univ. of Pitts. L. Rev. 115, 123-26 (1972).

In order to avoid the valid requirements of the Clean Streams Law, it is urged that the Board erred in disregarding a set of guidelines adopted to aid applicants for mine drainage permits. These guidelines, entitled *Guidelines Regarding Mining in Areas Affected by Inactive Workings*, were published by the Department of Health in its Mine Drainage Manual (2nd ed. June 1, 1966) and relied on by the Commonwealth Court in *Harmar Coal*. We need not discuss the applicability of these guidelines to the facts of these cases since we agree with the dissent in *Harmar Coal* and consider them to be nothing more than statements of policy and not binding on the Board as rules and regulations.

The introductory paragraph to these guidelines reads in part: "1. To guide the staff and the mining industry it appears essential that the Board adopt *general policies* regarding mining in areas affected by inactive workings. Listed below are some of the situations which may occur and recommended Board policy covering." (Emphasis added.) These guidelines were to be nothing more than policy statements and not formal regulations: had the Board intended otherwise, it would not have failed to file these guidelines with the Department of State as is required by Section 21 of the Administrative Agency Law, Act of June 4, 1945, P. L. 1388, *as amended,* 71 P.S. §1710.21, in order for them to become effective as regulations. *See Commonwealth v. Berlo Vending Co.,* 415 Pa. 101, 107 n. 4, 202 A. 2d 94, 97, n. 4 (1964). Although bound by a valid administrative regulation, *United States ex rel. Caputo v. Sharp,* 286 F. Supp. 516 (F. D. Pa. 1968), the Board is not bound to follow mere statements of policy. *Aizen v. Pennsylvania P.U.C.,* 163 Pa. Superior Ct. 305, 316, 60 A. 2d 443, 449 (1948).

More important, we are not bound by rulings or regulations which are contrary to the governing statutes under which they are promulgated. *Volunteer Fire-*

*men's Relief Association of City of Reading v. Minehart*, 425 Pa. 82, 227 A. 2d 632 (1967); *Commonwealth v. American Ice Co.*, 406 Pa. 322, 178 A. 2d 768 (1962). The Clean Streams Law properly requires treatment of the discharges in the present cases and, therefore, the guidelines, to the extent that they are contrary to the Clean Streams Law, are invalid.

Harmar makes two additional arguments that we shall briefly mention. First, Harmar asserts that the Commonwealth Court correctly concluded that the evidence was insufficient to support a number of the Board's findings of fact. A review of the record reveals that there was substantial evidence to support the first five findings of fact which are the crucial findings necessary to support the Board's conclusion of law that Harmar's discharge from the Indianola Mine can only be approved if it meets the Board's standards and does not pollute the receiving streams.[12]

Secondly, Harmar argues that the Board's action was deficient because there was no aquatic study made to determine if it was possible for aquatic life to survive in the water receiving the discharge from the Indianola Mine. Harmar believes, as did the Commonwealth

[12] The Board's first five findings of fact are as follows:

"1. The applicant, Harmar Coal Company, operates a deep coal mine (the Harmar Mine) in Indiana Township, Allegheny County.

"2. In order to insure the safety of the workers in the Harmar Mine, the applicant pumps mine water from an adjacent inactive mine (the Indianola Mine).

"3. The applicant's discharge from the Indianola Mine enters Deer Creek, a tributary of the Allegheny River and is a discharge of approximately five million gallons per day containing an iron concentrate in excess of seven milligrams per litre, the maximum concentration allowed under Board standards.

"4. The discharge from the Indianola Mine results in an iron concentration in the receiving stream in excess of standards approved by the Board.

"5. The discharge from the Indianola Mine is polluting the receiving streams."

Court, that an aquatic study is a prerequisite to the denial of a drainage permit. We disagree. Section 1 of the 1945 Amendment provided: " 'Pollution' shall be construed to mean noxious and deleterious substances rendering unclean the waters of the Commonwealth to the extent of *being harmful or inimical to the public health, or to animal or aquatic life, or to the use of such waters for domestic water supply, or industrial purposes, or for recreation.* The Sanitary Water Board shall determine when the discharge of any industrial waste, or the effluent therefrom constitutes pollution, as herein defined, and *shall establish standards whereby and wherefrom, so far as reasonably practicable and possible,* it can *be ascertained and determined whether any such discharge does or does not constitute pollution as herein defined.*" (Emphasis added.) The definition of "pollution" in the 1970 Amendments is to the same effect. Pursuant to its legislative authority, the Board adopted *standards* to determine if a discharge constitutes pollution. Section 6, Article 900 of the Board's rules and regulations provides in part:

"Section 6. Discharge Limitations.

"A. (amended October 19, 1966) There shall be no discharge of mine drainage which is acid.

"B. There shall be no discharge of mine drainage, containing a concentration of iron in excess of seven milligrams per liter.

"C. The pH of discharges of mine drainage shall be maintained between 6.0 and 9.0." The latter was adopted by the Board only after the holding of a public hearing and reviewing treatment facility experiments conducted by the Department of Mines and Mineral Industries. The Board determined that the effluent standard, taking into consideration dilution by the receiving stream, would protect the beneficial uses of the receiving stream, and is within the capability of the industry, both technologically and financially. Harmar's

own data submitted to the Department of Health revealed that the iron concentration of the mine drainage discharged from the Indianola Mine was at times as great as 56 milligrams per liter, clearly in excess of the standards set forth in Section 6(B) of Article 900. Harmar does not attack the reasonableness of the regulation, but rather asks that we substitute our judgment, by requiring an aquatic study, for that of a body selected for its expertise whose experience makes it better qualified than a court to establish technical standards. This we will not do. In the absence of a purely arbitrary exercise of an agency's duties or functions *"judicial* discretion may not be substituted for *administrative* discretion."  *Blumenschein v. Housing Authority of Pittsburgh,* 379 Pa. 566, 573, 109 A. 2d 331, 335 (1954). Our review is particularly restrictive where an administrative agency resolves complex questions of technology and finance. *Flaherty v. Port Authority of Allegheny County,* 450 Pa. 509, 299 A. 2d 613 (1973). The Board, having adopted standards of general applicability, need not also conduct aquatic studies in every instance to establish pollution.

Therefore, we conclude that the Clean Streams Law requires an operator of an active mine to treat the entire discharge from the active mine and a discharge from an adjacent inactive mine necessary to protect the active workings. Section 315 in both the 1965 and 1970 Amendments unambiguously uses the phrase "discharge from [the] mine." A strong indication that the Legislature intended the Act to apply to all discharges is found in the introduction to the 1965 Amendments where the Clean Streams Law was described as *"[a]n act . . . extending and increasing penalties for the discharge of any industrial waste into the waters of the Commonwealth."* It is evident from the Commonwealth's statement of policy in Section 4 of the 1965 Amendments, that no less than total treatment would be tolerated:

to repeat, Section 4 in part provides that: "It is the objective of the Clean Streams Law not only to prevent further pollution of the waters of the Commonwealth but, also *to reclaim and restore to a clean, unpolluted condition every stream in Pennsylvania that is presently polluted. . . ."* (Emphasis added.) In order to prevent further pollution and to reclaim and restore those surface waters presently polluted, *any* polluting discharge essential to the operation of a mine must be treated. If the operator of a mine need not treat these discharges, pollution will not end and the general public will be subjected to either the continued degradation of its surface waters or be forced to subsidize the coal industry by paying for treatment of this polluted water through its taxes. We are supported in our view by the statutory presumption "that the legislature intends to favor the public interest as against any private interest." Statutory Construction Act of May 28, 1937, P. L. 1019, §52, 46 P.S. §552. *See Commonwealth ex rel. Shumaker v. New York and Pennsylvania Co.,* 367 Pa. 40, 53, 79 A. 2d 439, 446 (1951). The public interest is not served if the public, rather than the mine operator, has to bear the expense of abating pollution caused as a direct result of the profit-making, resource-depleting business of mining coal.[13]

The orders of the Commonwealth Court are reversed and the orders of the Sanitary Water Board are affirmed.

Mr. Justice MANDERINO took no part in the consideration or decision of these cases.

---

[13] *See, generally,* Comment, *Survey The Commonwealth Court's Environmental Decisions,* 76 Dick. L. Rev. 668, 684-690 (1972).