581 A.2d 689

James B. **CAMERON**, Appellant,

v.

**COMMONWEALTH of Pennsylvania, Appellee.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Feb. 2, 1990.

Decided Oct. 22, 1990.

James J. Martin, Martin and Martin, P.C., Philadelphia, for appellant.

David R. White, Asst. Counsel, with him, Harold H. Cramer, Asst. Chief Counsel, and John L. Heaton, Chief Counsel, Harrisburg, for appellee.

Before CRUMLISH, Jr., President Judge, PELLEGRINI, J., and SILVESTRI, Senior Judge.

PELLEGRINI, Judge.

The Pennsylvania Supreme Court in *Department of Transportation, Bureau of Traffic Safety v. O'Connell*, 521 Pa. 242, 555 A.2d 873 (1989), recently held that because of the confusion arising out of situations in which an arrestee receives contemporaneous recitals of *Miranda* warnings and the implied consent law, Section 1547 of the Vehicle Code, 75 Pa.C.S. § 1547, an arrestee who requests to speak with or to call an attorney or anyone else, in response to a police request to take a breathalyzer test, must be instructed not only that his license will be suspended for one year if the arrestee refuses to take the test, but also that the rights reflected in *Miranda* warnings respecting criminal procedure, particularly, the right to assistance of counsel, are inapplicable to a breathalyzer test because the test constitutes civil process. The Supreme Court stated:

[W]here an arrestee requests to speak to or call an attorney, or anyone else, when requested to take a breathalyzer test, we insist that in addition to telling an arrestee that his license will be suspended for one year if he refuses to take a breathalyzer test, the police instruct the arrestee that such rights are inapplicable to the breathalyzer test and that the arrestee does not have the

right to consult with an attorney or anyone prior to taking the test.

*Id.*, 521 Pa. at 252, 555 A.2d 878.

In this appeal, James Cameron (Cameron) contends that the Bucks County Court of Common Pleas, in a *de novo* proceeding, erroneously applied the *O'Connell* test when it dismissed his appeal of a twelve month license suspension imposed by the Department of Transportation. The suspension was imposed pursuant to Section 1547 of the Vehicle Code, 75 Pa.C.S. § 1547. Cameron was convicted of driving under the influence of alcohol, 75 Pa.C.S. § 3731, and does not challenge that conviction.

The question of whether Cameron received the required *O'Connell* instruction involves an assessment of whether what was said by the Northampton Township Police to Cameron, during the course of alternating *Miranda* and implied consent warnings, was sufficient.

At approximately 1:40 a.m. on March 16, 1989, Cameron was arrested for driving while intoxicated in violation of 75 Pa.C.S. § 3731. Thus began a series of recitals of *Miranda* warnings and the implied consent law. The arresting Northampton Township police officer administered *Miranda* warnings to Cameron and took him into custody. Cameron was asked by another officer to submit to a breathalyzer test while in the rear seat of the patrol car and was advised of the implied consent rule and its implications, both for an automatic license suspension should he refuse to take the test and as well for his conviction for driving under the influence of alcohol should he refuse to take the test.

Following Cameron's arrival at the Township police station, the arresting officer once again administered *Miranda* warnings, and at approximately 1:55 a.m., a certified breathalyzer officer advised Cameron of the implied consent rule, reading it verbatim from a Xerox copy. Cameron refused to take the test. Again at 2:00 a.m., the arresting officer administered *Miranda* warnings, and at approximately 2:05 a.m., the breathalyzer officer once again read to Cameron

the copy of the implied consent rule. Cameron indicated that he understood the rule and reiterated his refusal to take the test. At approximately 3:30 a.m., Cameron contacted his attorney by phone and was advised to take the test. Thereafter, Cameron indicated his willingness to take the test; however, the breathalyzer officer informed him that, because of the lapse of nearly an hour and a half since Cameron's twice refusing to take the test at the station, Cameron's prior refusals precluded him from taking the test.

Following the first recitation of the implied consent statute at around 1:55 a.m., Cameron inquired about securing an attorney. The breathalyzer officer replied that "[a lawyer] was not necessary to take the test." R. 15a. *See also* R. 33a. The trial court concluded that this exchange between Cameron and the breathalyzer officer constituted a refusal by Cameron to take the test. Cameron, having received *Miranda* warnings from the arresting officer following that exchange, was again asked to submit to the breathalyzer test approximately ten minutes later at 2:05 a.m. Cameron was again advised by the breathalyzer officer that "a lawyer was not to be present to take the test, that this had to be his own decision to take this test or not." R. 16a. The trial court found that a second refusal occurred at this time, because Cameron made a knowing and conscious decision to refuse to take the test.

We find that none of the statements of record made by the Township Police constitute a qualifying instruction as contemplated by *O'Connell*. Absent from all of these statements is a clear communication that the right to counsel referred to in *Miranda* warnings is inapplicable to a breathalyzer test. Telling an arrestee that a lawyer need not be present or that consulting with an attorney or anyone else is not necessary before taking the test are insufficient instructions. Telling an arrestee that he must make this decision on his own is also insufficient. None of these statements informs an arrestee adequately of the extent of the right to counsel, nor does anyone of them

clarify for an arrestee that the right is inapplicable to chemical testing for intoxication. Clearly indicating that the right to counsel does not extend to a breathalyzer test achieves the *O'Connell* court's intent to insure that arrestees who exhibit confusion over their *Miranda* rights are not being misled into making *uninformed* and unknowing decisions to take the test. *Id.*, 521 Pa. at 253, 555 A.2d at 878. That the police officers involved in Cameron's arrest failed to give clear *O'Connell* instructions is understandable, since the incident in issue took place prior to the Supreme Court's *O'Connell* decision.

Formerly, a request for an attorney in response to an officer's request that an arrestee take a breathalyzer test could be taken as a refusal. *See Com., Dept. of Transp. v. Ferrara*, 89 Pa.Cmwlth. 549, 493 A.2d 154 (1985) (citing *King v. Department of Transportation, Bureau of Traffic Safety*, 81 Pa.Commonwealth Ct. 177, 472 A.2d 1196 (1984)). However, just as we expressed concern in *Ferrara* over the potential for unfair manipulation of arrestees who experience legitimate confusion as to their rights, the *O'Connell* court, when dictating that police bear the onus of affording arrestees a qualifying instruction, also expressed concern that situations like the matter under review are fraught with pitfalls for the arrestee who is unaware of the distinction between criminal and civil procedures. *O'Connell*, 521 Pa. at 252, 555 A.2d at 877.

The *O'Connell* court has indicated that the law has an obligation to demystify this situation. Accordingly, an arrestee is owed in the very least a clear explanation of his rights and, particularly, an instruction that the right to counsel does not apply to a breathalyzer test. The Supreme Court's holding in *O'Connell* was based upon a concern that without this instruction, individuals would be penalized for exercising the very rights which they believed that police officers were informing them that they had.

Because we have found that the instruction given to Cameron was legally insufficient to provide the insurance

516

sought by the Supreme Court in *O'Connell,* we reverse the order of the Bucks County Court of Common Pleas.

ORDER

AND NOW, this 22nd day of October, 1990, the order of the Court of Common Pleas of Bucks County in the above captioned matter docketed at No. 89–3371–12–6 is hereby reversed.

SILVESTRI, Senior Judge, dissenting.

I disagree with the majority not only as to their statement of the facts but also to their conclusion reversing the trial court. I would affirm the trial court.

The reproduced record of testimony (R. 1a–R. 39a) establishes the following facts.

Officer Hoffman of the Northhampton Township Police Department, Bucks County, while on routine patrol, in a marked patrol unit on March 16, 1989, at or about 1:40–1:45 o'clock a.m., observed a vehicle being operated in an erratic manner on East Holland Road. Officer Hoffman stopped the vehicle, determined the driver to be James B. Cameron (Cameron), (R. 4a–5a) and, by reason of his condition, placed him under arrest for DUI.

To back up Officer Hoffman, Sergeant Krauss and Officer Nobler arrived on the scene (R. 11a); Cameron was placed in Officer Hoffman's patrol car; Sergeant Krauss opened the back door and asked Cameron to submit to a breath test on an Intoximeter 3000, and advised him that a refusal to do so would result in a suspension of his license for one year (R. 7a, 12a). Thereafter, Officer Nobler, Cameron, with Officer Hoffman driving, went to the police headquarters in Officer Hoffman's patrol car. Sergeant Krauss remained with Cameron's vehicle at the scene of the arrest (R. 12a).

Upon arrival at the police headquarters, Officer Hoffman gave Cameron the Miranda warnings [1] (R. 8a, R. 32a) and turned him over to Officer Nobler (R. 8a) in the Intoximeter room (R. 12a, 32a).

Officer Nobler, at or about 1:55 o'clock A.M., read to Cameron from "a Xerox copy of the Pennsylvania Motor Vehicle Code, 1547,[2] implied consent rule. I read it verbatim, counsel, explaining to Mr. Cameron that his failure to take this test would result in a one-year suspension of his driver's license, and he would still be charged under the influence of alcohol." (R. 13a) Officer Nobler also showed Cameron the affidavit that would be filled out if he refused to take the Intoximeter test and he refused, saying "I'm not taking any test." [3] Officer Nobler waited 10 minutes and, at or about 2:05 o'clock a.m., again read the implied consent rule to Cameron. When asked if he understood the implied consent rule, Cameron said "Yes. I am not taking the test." At this point, Officer Nobler shut down the breatha-

1. Officer Hoffman neither at the arrest scene nor at police headquarters gave Cameron any warnings or information relative to the breathalizer test and/or implied consent (R. 7a).

2. 75 Pa.C.S. § 1547(b) provides:
   (b) Suspension for refusal.—
   (1) If any person placed under arrest for violation of section 3731 (relating to driving under influence of alcohol or controlled substance) is requested to submit to chemical testing and refuses to do so, the testing shall not be conducted but upon notice by the police officer, the department shall suspend the operating privilege of the person for a period of 12 months.
   (2) It shall be the duty of the police officer to inform the person that the person's operating privilege will be suspended upon refusal to submit to chemical testing.
   (3) Any person whose operating privilege is suspended under the provisions of this section shall have the same right of appeal as provided for in cases of suspension for other reasons.

3. At R. 20a, Cameron's counsel cross-examined Officer Nobler, as follows:
   Q Isn't it true that Mr. Cameron said to you, when he was first asked to take the test, he said, "Why do I need to take the test? I'm drunk." Didn't he say that to you?
   A He said that in my presence, yes.
   Q And that was in response to your giving him the implied consent law, which you said you read from the form or card?
   A Uh-huh.

lyzer machine and proceeded to make out the affidavit of refusal. (R. 13a–14a).

Cameron, at some time between 1:55 o'clock A.M. and 2:05 o'clock A.M., asked to speak with a lawyer and was told he could do so but it was not necessary to take the test. (R. 15a, 33a) Cameron attempted to contact a lawyer and "could make no contact." Officer Nobler, at this time, told Cameron that "a lawyer was not to be present to take that test, that this had to be his own decision to take this test or not." (R. 16a).

The second refusal to take the test was at or about 2:05 o'clock A.M., 10 minutes after the first refusal. Cameron was still given the opportunity to contact an attorney while Officer Nobler was doing the paperwork. (R. 16a).

At about 3:30 o'clock A.M., Cameron talked to an attorney, and then stated to Officer Nobler that he was willing to take the Intoximeter test. At the time of the phone contact with the attorney, the police officers were ready to leave for the district magistrate's office. Officer Nobler told Cameron "The refusal is already in. We're ready to leave." (R. 27a)

Cameron's reason for not taking the breathalizer test, given in response to his attorney's questioning on redirect examination at R. 39a, is as follows:

By Mr. Kardos

Q Did you at anytime tell the officers that you were drunk?

A Oh, yes.

Q How many times did you admit you were drunk?

A I told them immediately I was intoxicated. I told them several times that I was intoxicated.

Q Is that why you thought the breath test wasn't necessary?

A That's true.

The Supreme Court in *Commonwealth, Department of Transportation v. O'Connell*, 521 Pa. 242, 555 A.2d 873 (1989), before addressing the question of warnings, set

forth the function of the appellate courts when reviewing the facts of a case, as follows:

When appellate courts review the decision of a court of common pleas in a license suspension case, the scope of review is limited to determining whether the findings of facts of the trial court are supported by competent evidence and whether the trial court committed an error of law or an abuse of discretion in reaching its decision. *Commonwealth of Pennsylvania, Department of Transportation v. Korchak,* 506 Pa. 52, 483 A.2d 1360 (1984); *Bureau of Highway Safety v. Wright,* 355 Pa. 307, 49 A.2d 783 (1946).

Questions of credibility and conflicts in the evidence presented are for the trial court to resolve, not our appellate courts. *Korchak;* see also *Waigand v. Commonwealth,* 68 Pa. Commonwealth Ct. 541, 449 A.2d 862 (1982); *McMahon v. Commonwealth,* 39 Pa. Commonwealth Ct. 260, 395 A.2d 318 (1978).

As long as sufficient evidence exists in the record which is adequate to support the finding found by the trial court, as factfinder, we are precluded from overturning that finding and must affirm, thereby paying the proper deference due to the factfinder who heard the witnesses testify and was in the sole position to observe the demeanor of the witnesses and asses their credibility. This rule of law is well established in our jurisprudence and is rooted in concepts of fairness, common sense and judicial economy. *Norfolk & W. Ry. Co. v. Pa. Public Utility,* 489 Pa. 109, 413 A.2d 1037 (1980); *PHRC v. Chester Housing Authority,* 458 Pa. 67, 327 A.2d 335 (1974); *Burbage v. Boiler Eng'g. & Supply Co.,* 433 Pa. 319, 249 A.2d 563 (1969); *D.F. Bast, Inc. v. Pa., PUC,* 397 Pa. 246, 154 A.2d 505 (1959); see also, *McGovern's Estate v. State Employment Retirement Bd.,* 512 Pa. 377, 517 A.2d 523 (1986).

In affirming the suspension of Cameron's driver's license, the trial court filed an opinion in which it found the following facts:

[T]hat at or about 1:40 a.m. on March 16, 1989, Cameron was observed driving in an erratic manner by Officer Donald B. Hoffman of the Northhampton Township Police Department. Cameron was found to be under the influence of alcohol and was arrested for driving under the influence of alcohol in violation of 75 Pa.C.S. § 3731 [1] *Cameron was then advised of his Miranda rights.* After being taken into custody for the offense and placed in the back seat of the patrol vehicle, Cameron was asked to submit to a breathalyzer test. At the same time, he was also advised of the implied consent rule, that a refusal to submit to a breathalyzer would result in a one year suspension of his driver's license, and would also result in an arrest for DUI. (N.T., pp. 6–7, 11)

Following their arrival at police headquarters and prior to the attempted administration of the breath test, Officer Hoffman *again* read to Cameron his *Miranda* rights.

Next, at approximately 1:55 a.m., Cameron was taken by Officer Nobler to the breathalyzer testing room where Nobler read verbatim words of the implied consent rule.[2] Cameron responded by refusing to take the test. After a 10 minute period had elapsed, Officer Nobler reread the verbatim words of the implied consent rule and asked Cameron if he understood the meaning of the words. Cameron responded that he understood the rule, but that he still refused to take the test. (N.T., pp. 12, 13)

Officer Nobler also testified that during this same time period, Cameron asked if he could speak to a lawyer. The Officer allowed Cameron to attempt to contact an attorney but he additionally advised Cameron that an attorney was "not necessary to take the test" (N.T., p. 14) and that "a lawyer was not to be present to take the test, that this had to be his own decision to take the test or not." (N.T., p. 15)

After the second refusal, Officer Nobler continued to afford Cameron the opportunity to contact an attorney while he and the other officers completed their paper work. Cameron made several attempts to call his lawyer

or a police acquaintance. Subsequently, at approximately 3:30 p.m. [sic] or one and one-half hours after the first refusal, Cameron successfully reached his attorney, James Martin. (N.T., pp. 14, 15) Mr. Martin advised Cameron to submit to the breathalyzer test. (N.T., p. 9)

Cameron then told the officers he was willing to take the test. However, at this point, because of the time lapse since the initial refusal, Officer Nobler advised Cameron that the refusal had already been recorded and that he could not take the test. (N.T., p. 16) (Emphasis added.)

---

[1] From the stipulations entered at the de novo hearing, it is undisputed that the Commonwealth met its burden in establishing the elements necessary for a DUI arrest and conviction under 75 Pa. C.S.A. § 3731.

[2] Pa.C.S.A. § 1547(b), provides:

(b) suspension for refusal (there then follows the text of subsection (b)).

The majority, in its opinion in support of reversal of the suspension of the driver's license, writes at page 690, as follows:

At approximately 1:40 a.m. on March 16, 1989, Cameron was arrested for driving while intoxicated.... *Thus began a series of recitals of Miranda warnings and the implied consent law. The arresting Northhampton Township police officer administered Miranda warnings to Cameron and took him into custody.*

Following Cameron's arrival at the Township police station, the arresting officer *once again administered Miranda warnings.* (Emphasis added.)

Both the trial court, in its opinion, and the majority, in its opinion, state that Cameron was given *Miranda* warnings at the time he was arrested by Officer Hoffman. There is nothing in the reproduced record to support directly or

inferentially this statement of fact by each.[4] The reproduced record at R. 6a, 7a, 8a states as follows:

Direct Testimony of Officer Hoffman at R. 6a, 7a and 8a

By McCardell

Q At the point of your arrest, did you advise him at all of the implied consent rule at the stop?

A I did not. . . .

. . . .

Q Did you ever give him Miranda warnings?

A At headquarters, yes, sir, I did.

Q Do you recall whether that was before or after he was tested or attempted to be tested?

A That was prior

The majority, in its opinion at page 690, writes as follows: *Again at 2:00 a.m., the arresting officer administered Miranda warnings and* at approximately 2:05 a.m., the breathalyzer officer once again read to Cameron the copy of the implied consent rule. (Emphasis added.)

The reproduced record reveals that Officer Hoffman gave Cameron the *Miranda* warning *only once,* and that was upon arrival at police headquarters.

Officer Nobler, the breathalyzer officer, testified on direct examination that he accepted Cameron from Officer Hoffman and that he did not hear Officer Hoffman read the *Miranda* warnings to Mr. Cameron. The matter of Cameron being given *Miranda* warnings for the third time, at about 2:00 a.m. apparently was gleaned by the majority from the cross examination of Officer Nobler by Cameron's counsel, Mr. Kardos, at R. 24a and 25a, as follows:

By Mr. Kardos

Q Now, this is a police report indicating certain notations as to time, does it not?

A Yes, it does.

4. It is understandable that the majority stated that Cameron was mirandized at the time of the arrest since the trial court stated this in its opinion.

Q And according to you, you gave the implied consent law reading to Mr. Cameron at 1:55. Is that right?

A Correct.

Q And you signed that?

A Uh-huh.

Q And then at 2:00, Mr. Cameron was read his rights by Officer Hoffman, was he not?

A I don't know.

Q Is that what this report says?

A That's what he says, but that's not all my handwriting in that report.

Q At 2:05, does it not say that you then gave the implied consent law again to Mr. Cameron?

A Yes, it does.

Q So at 2:00 his rights were read, and 2:05 the implied consent law?

A 1:55 they were read also. You're leaving that out.

Q 1:55 they were read. At 2:00, Miranda rights were given, and at 2:05 the implied consent law was given to him again. Isn't that correct?

A According to that paper, yes. That's back at our headquarters.

Significantly, Mr. Kardos (a) did not identify the "police report" as to who prepared it, (b) did not read into the record the "notations as to time", (c) did not admit the "police report" in evidence, (d) did not confront Officer Hoffman with the "police report" or cross-examine him about *Miranda* warnings at 2:00 a.m. or at any other time.

The trial court, in its opinion, did not find that the *Miranda* warnings were given at 2:00 a.m.

There is nothing in the reproduced record of the testimony to support the majority's statement that *Miranda* warnings were given at 2:00 a.m.

We set forth at some length, the facts from the reproduced record together with the opinion of the trial court and excerpts from the majority opinion to demonstrate that, with the exception of the trial court erroneously finding

that Cameron was given *Miranda* warnings at the time he was arrested by Officer Hoffman, all other findings of fact by the trial court are supported by the testimony in the reproduced record.

The reproduced record establishes, and the trial court found, that at the time Cameron was placed under arrest he was asked by Sergeant Krauss to submit to a breath test and he was advised that a refusal to do so would result in a suspension of his license for one year, and would also result in an arrest for DUI whether he agreed to the test or not.

The reproduced record neither discloses the time Cameron arrived at police headquarters nor the time he was given *Miranda* warnings for the first and only time. The reproduced record is devoid of Cameron making a request for an attorney, either when given the implied consent rule by Sergeant Krauss at the scene of the arrest, or following Officer Hoffman's giving him *Miranda* warnings at police headquarters, or Officer Nobler giving him the implied consent rule at or about 1:55 a.m.

After Cameron refused to undergo the breathalyzer test at 1:55 a.m., there was a hiatus of 10 minutes. The record isn't clear as to the order of occurrence but Officer Nobler re-read the implied consent rule to Cameron, Cameron refused to take the test, and Cameron asked to call his lawyer, which he was permitted to do. In any event, it is clear that it was not until Officer Nobler was prepared to administer the breathalyzer test at 2:05 a.m. that Cameron asked to speak to an attorney.

The majority states in its opinion that

[B]ecause of the confusion arising out of situations in which an arrestee receives contemporaneous recitals of Miranda warnings and the implied consent law, ... an arrestee who requests to speak with or to call an attorney or anyone else, in response to a police request to take a breathalyzer test, *must* be instructed *not only* that his license will be suspended for one year if the arrestee refuses to take the test *but also that the rights reflected in Miranda warnings respecting criminal procedure,*

*particularly the right to assistance of counsel, are inapplicable to a breathalyzer test because the test constitutes civil process.* (Emphasis added.)

There is no testimony in the reproduced record to find as a fact, much less infer, that there were "contemporaneous recitals of *Miranda* warnings and the implied consent law ..." or "a series of *Miranda* warnings and the implied consent law." Further, the statement by the majority of what is to be told to an arrestee goes beyond the holding of *O'Connell.* The Supreme Court said that when an arrestee requests to speak to or call an attorney, or anyone else, at a time that he/she is asked to take a breathalyzer test, the official authority making the request must tell the arrestee:

1. that his license will be suspended for one year, if he/she refuses to take a breathalyzer test, and

2. that the right to assistance of counsel in the underlying criminal charge giving rise to the request for a breathalyzer test is not a right applicable to an official request to submit a breathalyzer test, and

3. that the arrestee does not have the right to consult with an attorney or anyone else prior to taking the test.

In determining whether an arrestee is properly instructed as to his/her rights when he/she requests an attorney after being requested by official authority to take a breathalyzer test, the total circumstances of the arrest must be considered. This includes the time, place, manner and number of times (a) *Miranda* warnings were given, (b) a request to take the breathalyzer test was made, and (c) the arrestee's request for an attorney was made.

The trial court determined from the totality of the circumstances that the police of Northhampton Township properly instructed Cameron as required by *O'Connell.* Since the trial court's determination is bottomed upon a factual record (eliminating therefrom the trial court's finding that *Miranda* warnings were given at the time of the arrest), which supports its conclusion, I would affirm the order of the trial court denying the appeal and affirming the suspension imposed by DOT.